UNITED STATES of America, Appellee,

v.

John Edward JONES, a/k/a Liddy Jones, a/k/a Malik Shariff, Appellant.

UNITED STATES of America, Appellee,

v.

Robert Avon JONES, a/k/a Bobby, Appellant.

Nos. 73–2520 and 73–2521.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 8, 1975.

Decided Feb. 9, 1976.

**192**

Howard L. Cardin [court-appointed counsel], Baltimore, Md., and (James J. Gitomer, Baltimore, Md., on brief), for appellant in No. 73–2521.

Robert P. Geary [court-appointed counsel], Highland Springs, Md., for appellant in No. 73–2520.

Andrew Radding, Asst. U.S. Atty., Baltimore, Md. and (Jervis S. Finney, U.S. Atty., Baltimore, Md., on brief), for appellee in Nos. 73–2520 and 73–2521.

Before BRYAN, Senior Circuit Judge, and WINTER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The appellants, with seven others, were indicted for conspiracy to violate the narcotics laws of the United States,[1] and for possession with intent to distribute heroin.[2] The appellants were found guilty by a jury

1. 21 U.S.C. § 846.

2. 21 U.S.C. § 841(a)(1).

of conspiracy to violate the narcotics laws. John Edward Jones, as a second-time offender, was given a sentence of thirty years, and Robert Avon Jones was sentenced to fifteen years. The appellants make thirteen assignments of error, which we shall hereafter discuss. We, however, find the appeal without merit and affirm.

### Prejudicial Publicity

The defendants aver as their third and fourth grounds of error alleged prejudicial publicity, both pre-trial and during trial. They raised their claim of prejudicial pre-trial publicity by a motion for continuance; they made repeated motions for a mistrial during the trial on account of what they asserted was prejudicial in-trial publicity. We find no error in the denial either of the motion to continue or of the repeated motions for a mistrial.

### (a) Pre-trial Publicity

Save in that rare case where there is a showing of "inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors" [3]—which is certainly not this case—the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity—whether in connection with a motion for continuance or for a change of venue—is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial. *See Wansley v. Slayton* (4th Cir. 1973), 487 F.2d 90, 92–3, *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773. As stated in *United States v. Milanovich* (4th Cir. 1962), 303 F.2d 626, 629 *cert. denied*,

371 U.S. 876, 83 S.Ct. 145, 9 L.Ed.2d 115 (1962). "[W]henever it appears that shortly before a trial public news media in the community have published incompetent and prejudicial information about the case or the defendant, a duty devolves upon the trial court to make certain that the necessary conditions of a fair trial have not been impaired." [4] And this, in turn, depends on "whether it is possible to select a fair and impartial jury," for this is, after all, "[T]he ultimate question." *Blumenfield v. United States* (8th Cir. 1960), 284 F.2d 46, 51, *cert. denied*, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961). It accordingly was not sufficient, as a basis of a motion for a continuance on this ground, to allege simply adverse publicity "without a showing that the jurors were biased thereby." *Ignacio v. People of Territory of Guam* (9th Cir. 1969), 413 F.2d 513, 518, *cert. denied*, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970). And the proper manner for ascertaining whether the adverse publicity may have biased the prospective jurors was through the voir dire examination.[5]

At the voir dire examination of the prospective jurors only eight of the prospective jurors stated they had heard of the case or seen any publicity about it or the defendants. All eight were excused and no one who had heard of the case sat on the jury. Even had there been prejudicial pre-trial publicity, it was not thus such as to deny to the defendants the right to be tried by a fair and impartial jury, uninfluenced by any prejudicial pre-trial publicity of any kind. In *United States v. DiTommaso* (4th Cir. 1968), 405 F.2d 385, 393, *cert. denied*,

---

3. *McWilliams v. United States* (8th Cir. 1968), 394 F.2d 41, 44, *cert. denied*, 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969).

See *Sheppard v. Maxwell* (1966), 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Estes v. Texas* (1965), 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543, *reh. denied*, 382 U.S. 875, 86 S.Ct. 18, 14 L.Ed.2d. 543; *Rideau v. Louisiana* (1963), 373 U.S. 723, 727, 83 S.Ct. 1417, 10 L.Ed.2d. 663, for instances of such "inherently prejudicial publicity."

Whether the facts in a particular case meet the criteria of "inherently prejudicial publicity" is ordinarily committed to the discretion of the trial court. *United States v. Nix* (5th Cir. 1972), 465 F.2d 90, 96, *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972), *reh. denied*, 409 U.S. 1119, 93 S.Ct. 918, 34 L.Ed.2d 704.

4. *See, also, United States v. Sorce* (4th Cir. 1962), 308 F.2d 299, 301, *cert. denied*, 377 U.S. 957, 84 S.Ct. 1635, 12 L.Ed.2d 500 (1964).

5. *Wansley v. Slayton, supra* (at 92–3); *United States v. Abbott Laboratories* (4th Cir. 1974), 505 F.2d 565, 571, *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 671 (1975).

394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969), this court, in dealing with a similar situation, said: "[M]anifestly, there was no showing [under these facts] that, even if prejudicial, there was sufficient publicity to infect the jury and indicate the need for a change of venue." That is the situation here. The trial court accordingly committed no error in·denying defendants' motion for continuance.

### (b) In-trial Publicity

 After the jury was selected and sworn, they were not sequestered,[6] but the trial judge firmly and clearly admonished the jurors that they were to abstain from reading or listening to anything about the trial or from talking to anyone about it. This admonition was repeated consistently throughout the trial. However, as the trial progressed, the defendants made a number of motions for a mistrial on the basis of what they asserted to be prejudicial reporting of the trial in the local press. On most of the occasions when the motions were made, the defendants contented themselves with submitting to the trial court the press clippings which they charged were prejudicial without pointing out wherein the press articles were unfair or inaccurate. They now appeal, asserting that the trial court was required to poll the jury in order to ascertain whether any juror had seen the press accounts.

We did enunciate in *United States v. Hankish* (4th Cir. 1974), 502 F.2d 71, 77, and reaffirmed in *United States v. Pomponio* (4th Cir. 1975), 517 F.2d 460, 463, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975), the rule that, "when highly prejudicial information may have been exposed to the jury, the court must ascertain the

extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial." In carrying out this duty, the court should follow, we held, the procedure outlined in *Margoles v. United States* (7th Cir. 1969), 407 F.2d 727, 735, *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). There, the Court said that inquiry should be made whether any jurors "had read or heard" the prejudicial publicity and, if any·had, that juror should "be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." But, in *Hankish,* we were careful to point out that, "[W]e do not hold that every newspaper article appearing during trial requires such protective measures. *Unless there is substantial reason to fear prejudice,* the trial judge may decline to question the jurors."[7] It follows then that whenever a claim of in-trial prejudicial publicity arises, the threshold question, or, as the Court in *United States v. Pomponio, supra,*[8] put it, the "initial determination" for the trial court is whether the publicity rises to the level of substantial prejudicial material. If it does not rise to such a level, the trial court is under no duty to interrogate the jury or to take the steps mandated by *Hankish.* And whether it does rise to the level of substantial prejudice requiring that procedure is ordinarily a question "committed to the trial court's discretion" and "the scope of this judicial discretion includes the responsibility of determining the extent and type of investigation requisite to a ruling on the motion."[9] And,

---

**6.** Neither the Government nor the defendants appear to have requested that the jury be sequestered at this stage of the trial.

**7.** 502 F.2d at 77 (Italics added).

Other cases in fixing the conditions for a rule such as that enunciated in *Hankish* have used phrases restricting it to cases where "*substantial* prejudice has occurred," *United States v. Armocida* (3d Cir. 1975), 515 F.2d 29, 49 (Italics in opinion), or where there is "the likelihood

that seriously prejudicial materials may have reached the jury," *United States ex rel. Doggett v. Yeager* (3d Cir. 1973), 472 F.2d 229, 239.

**8.** At 463.

**9.** *Gordon v. United States* (5th Cir. 1971), 438 F.2d 858, 872–3, *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56, *reh. denied,* 404 U.S. 960, 92 S.Ct. 312, 30 L.Ed.2d 279 (1971); *United States v. Kaplan* (2d Cir. 1974), 510 F.2d 606, 612; *United States v. Burke* (9th Cir.

while in reviewing the determination by the District Court of this issue, we must "make an independent evaluation of the circumstances," *Sheppard v. Maxwell, supra,*[10] we should "accord deference to the judge's informed discretion," *United States v. Anderson* (1974), 165 U.S.App.D.C. 390, 509 F.2d 312, 324, *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

■ The authorities have marked out fairly clearly what is substantial prejudicial material and what is not, or, as one Court has phrased it, the "degree of prejudice [which] must be shown to trigger the court's responsibility to investigate further [in-trial publicity] by specifically questioning the jury * * *." *United States v. Thomas* (7th Cir. 1972), 463 F.2d 1061, 1063. With hardly an exception, the cases in which substantial prejudicial publicity during trial was found, the publicity involved "information about the defendant that would not be admissible before the jury or that was not in fact put before the jury in court." *United States v. Hyde* (5th Cir. 1971), 448 F.2d 815, 849, *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).[11] This was true in *Marshall v. United States* (1959), 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, where the assailed publicity consisted of information with reference to prior convictions of the defendant and his wife and was "information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evi-

dence."[12] In *Sheppard v. Maxwell, supra* (384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600) the press ran editorials declaring in effect the defendant's guilt, published cartoons suggesting plainly defendant's guilt and created in their barrage of comments and editorials a general community prejudice so strong that when the names of the prospective jurors became known, they were subjected to anonymous telephone calls and letters. Later at the trial, the proceedings assumed a circus-like atmosphere, with press, television and radio reporting intruding into every aspect of the trial. In *Silverthorne v. United States* (9th Cir. 1968), 400 F.2d 627, another case strongly relied on by the defendants, the newspaper publicity implied the defendants had been involved in sexual misconduct and, in reporting the trial, the editorials and news accounts were evaluations of the strength of the prosecution's case and the weakness of the defense with obvious emphasis on the latter.[13] In *Hankish,* the newspaper article had in effect stated that the defendant was a racketeer, who had directed a multistate theft ring which had been broken up in 1969 and that during the operations of that ring the defendant had suffered the loss of both legs "when his car was blown up in gangland fashion." This was publicity of material that was not admissible in defendant's trial and was similar to that found prejudicial in *Marshall, supra* (360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250). In *Pompo-*

1974), 506 F.2d 1165, 1170, *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975).

**10.** 384 U.S. at 362, 86 S.Ct. at 1522.

**11.** This is the effect of *Margoles* (407 F.2d 727), the authority on which *Hankish* (502 F.2d 71) rests. In explicating the rule as previously stated in *Margoles,* the Seventh Circuit, in the subsequent case of *United States v. Thomas, supra* (463 F.2d at 1063), said:

"This circuit has specifically defined minimal measures a district judge is required to take when confronted with evidence of prejudicial publicity prior to and during a trial. Thus, when apprised in a general fashion of the existence of damaging publicity, the district judge is only called upon to 'strongly and repeatedly [admonish] the jury throughout the trial not to read or listen to any news coverage of the case.' *Margoles v. United*

*States, supra* at 733. When the publishing of *specific examples of inadmissible evidence* is brought to the court's attention, further investigation is required to determine juror exposure to it; * * *." (Italics added)

It is accordingly the publication of *"inadmissible evidence"* that will normally trigger any requirement of specific juror inquiry; absent such situation, a general admonition to the jury is considered sufficient.

**12.** 360 U.S. at 312, 79 S.Ct. at 1173.

For similar situations, see *United States v. Palermo* (7th Cir. 1969), 410 F.2d 468, 471–2; *United States ex rel. Doggett v. Yeager, supra* (472 F.2d at 239); *United States v. Margoles, supra* (407 F.2d at 735) (publication of prejudicial inadmissible evidence).

**13.** 400 F.2d at 642.

*nio* the newspaper account dealt with "[O]ther pending charges [which] could not have been raised even if the defendants had chosen to take the stand" and with proceedings that took place outside the presence of the jury; it "dealt with matters that could not have been raised before the jury." [14]

██ We have none of that in this case. The newspaper publicity of which the defendants complained was, except for some testimony of the witness House to which we shall refer later,[15] and one other instance of publicity to which we shall refer in a moment, an accurate condensed statement of testimony actually admitted into evidence and heard by the jury. The news accounts did not attempt, as did the newspaper reporters in *Silverthorne,* to evaluate the testimony to the prejudice of the defendants. They included no inadmissible evidence or evidence that was not available to the jury or evidence that either then or later was not fully developed in evidence heard by the jury.

 It is argued, though, that there were news accounts of threats against both the trial judge and others engaged in the prosecution, threats that were not a part of any evidence available to the jury and that such publicity was so prejudicial as to require the application of the *Hankish* rule. There were, it is true, such threats and news accounts of those threats published— but there was never any opportunity of exposure of those accounts to the jury, except in the case of a single juror which is later discussed. These threats were first reported in the afternoon papers in the City of Baltimore on July 17, 1973. The headline in one paper, detailing the threats, read "Free Liddie Jones or Die." These articles did not, however, appear until the afternoon editions of the newspapers were on the street. That, it is conceded, did not occur until about eleven o'clock on the morning of July 17th. At that time the jury was engaged in the trial and was, for all practical purposes sequestered. In the meantime, the news story had been brought to the attention of the trial judge, who did not release the jury at the lunch recess that day but ordered their meals served them in the jury room, thereby effectively sequestering them from the publicity about the threats. Immediately after lunch, the jurors were advised they were being sequestered until after the trial was concluded. This action was taken over the objection of counsel for the defendants but it effectively insulated the jury from the threatening headline. Later that evening, the juror Duni was being taken by a deputy marshal to his home for articles needed during sequestration. While being so driven, he inadvertently saw an afternoon newspaper, including the threatening headline, in a rack on a street corner. Without discussing what he had seen with anyone else, he asked to see the trial judge, expressed to the judge his fear on account of the newspaper headline he had seen, and requested that he be excused as a juror. He was of the opinion that the fear generated by the headline would prevent him from rendering a fair and impartial verdict. He was excused. There is no reason to assume that any other juror than Duni saw the threatening headline. As we have said, they had been in effect sequestered before the newspaper appeared with its headline of the account of the threats. Nor is there any basis for assuming that Duni told any other juror of the headline he had seen; he specifically denied under oath that he had communicated such information to anyone. The trial court expressed the fear that, to interrogate the jury either as a whole or

---

14. 517 F.2d at 462–3.

15. The matters that "could not have been raised before the jury" in *Pomponio* was the refusal of certain parties to testify in proceedings, as expressed at a hearing held outside the presence of the jury. In this case, the witness Carolyn House, to whom subsequent reference is made, refused in proceedings outside the presence of the jury to testify because of fear of retaliation. But this circumstance, which, if true, might warrant a new trial under the ruling in *Pomponio,* was rendered harmless when the witness House later testified and her prior testimony out of the presence of the jury was fully developed *before the jury* in the cross-examination of defendants' counsel.

individually about the threatening headline, would have aggravated the problem. His opinion in this regard was certainly prudent. Under the circumstances, we find no error in the trial court's ruling.

■ There was, it is true, considerable argument about another news story. It did not, though, refer to the defendants or to their trial. It dealt with the murder of a city alderman who was said to have engaged in the "drug traffic." It is true that in the latter parts of the stories about the alderman's death, two names were used that had been referred to but only obliquely in the Jones trial. We agree with the trial judge that the possibility of prejudice from such publication was too remote to require more than the admonition which was firmly and repeatedly given by the trial court.

■ In summary, we find no error in the failure of the trial judge to interrogate the jurors about publicity during trial or to declare a mistrial on account of such publicity.

### Grant of Immunity in State Grand Jury Proceedings as Bar to the Prosecution of the Defendant Robert Jones

The defendant Robert Jones argues that the trial court erred in denying his motion to dismiss the federal prosecution and for the suppression of evidence on the ground that the evidence to be offered against him by the Government flowed directly or indirectly from the prior testimony given by him under a State grant of immunity before a State grand jury. His co-defendant John Edward Jones joins in this contention, asserting that he would have been benefit-

ed in his defense had the motion been granted.[16]

The trial court granted a pre-trial hearing on the motion. At that pre-trial hearing the Government accepted the burden of establishing that the evidence it intended to offer was not "tainted" by any direct or "derivative" use of Robert Jones' State grand jury testimony. It offered testimony in support of this position. On the basis of that testimony, the District Court found as a fact that the Government had negated taint in its proposed proof against the defendant but, at the request of the Government, for reasons amply supported in the record, agreed that the determination whether the evidence used by the Government at trial against the moving defendant was "derived from a legitimate source wholly independent of the compelled testimony of the defendant" be deferred until trial.

At the conclusion of the testimony at the trial, the District Court held a hearing on the immunity issue. Following this hearing, the Court filed a carefully considered order, in which, after discussing the immunity rule as it had been developed in *Kastigar v. United States* (1972), 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212, and *Murphy v. Waterfront Commission of New York* (1964), 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678,[17] it reaffirmed its prior finding of fact that the Government's evidence against Robert Jones "was not tainted by the compelled testimony of Jones before the state grand jury" and found as an additional fact that "the evidence used by the United States at the trial of Jones was derived from a legitimate source wholly independent of his compelled testimony." On the

---

**16.** The standing of the co-defendant to raise this claim is doubtful at best. *See United States v. Lewis* (3d Cir. 1972), 456 F.2d 404, 409, and *Lopez v. Burke* (7th Cir. 1969), 413 F.2d 992, 994. It is unnecessary, though, to pursue this point, since we conclude that the motion to suppress was without merit.

**17.** *See, also, Maness v. Meyers* (1975), 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574. These cases establish that the privilege against compulsory self-incrimination granted by the Fifth Amendment prohibits the use of any such com-

pelled testimony "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," and "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *See* 406 U.S. at 444–5, 92 S.Ct. at 1656. It, however, specifically "has never been construed to mean that one who invokes it cannot subsequently be prosecuted." 406 U.S. at 453, 92 S.Ct. at 1661.

basis of these findings of fact, it denied the motion to dismiss and to suppress.

 The defendants, in pressing their challenge to the trial court's dismissal of their motion both to suppress and to dismiss, urge that the trial court should have "disposed [of the motion] * * * pre-trial" and not post-trial. *United States v. De Diego* (1975), 167 U.S.App.D.C. 252, 511 F.2d 818, 824, however, unequivocally declares that it is discretionary with the trial court whether it will resolve the issue of taint at a pre-trial hearing, during trial or at a post-trial hearing or "a combination of these alternatives." And in *United States v. First Western State Bank of Minot, N. D.* (8th Cir. 1974), 491 F.2d 780, 787, the Court observed that, "[T]he ascertaining of independent sources can often be better considered during the trial, since all the evidence is placed on the record or offered for introduction at the trial."[18] Again, *United States v. McDaniel* (8th Cir. 1973), 482 F.2d 305, 312, a case relied on below by the defendants, followed the practice suggested in *First Western* and the practice adopted by the District Court in this case, and held the hearing for suppression post-trial. And there were sound rea-

sons beyond those stated in *First Western* and followed in *McDaniel* why the determination of the reserved issue should have been delayed in this case. Not only would a hearing determinative of the issue pre-trial have required the Government to expose its complete case and to have identified all its witnesses but also would have compelled it to do so under circumstances fraught with considerable peril to its witnesses. The threat of harassment and even intimidation of the Government's witnesses was real.[19] The trial court, in our judgment, wisely exercised its discretion to delay final ruling on the motion until after trial.

 This, however, is not the primary thrust of the defendants' argument on this phase of their appeal. They argue that the Government did not meet the test established in *Murphy* and *Kastigar*[20] for removing any taint of impermissibility from its testimony against the defendant Robert Jones because of his testimony given under a grant of immunity before the state grand jury. In *Murphy*, which established "the use-restriction immunity concept" as distinguished from "the transaction immunity concept" in connection with a witness' grand jury testimony,[21] the Court said:

> There are certain proposed standards to be applied in compelled testimony cases set forth in a Note, *Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli*, 82 Yale L.J. 171 (1972) but the proposed standards have not received any judicial approval and are of doubtful application in the inter-jurisdictional case as is the situation here. The editor recognizes this inter-jurisdictional problem but his solution is of doubtful practical value. *See* pp. 185–7.

18. There is no inconsistency between this practice and that prescribed in Rule 12(b)(4), Fed.R. Crim.P. That rule provides that, "[A] motion before trial raising defenses or objections shall be determined before trial *unless the court orders that it be deferred* * * *."* (Italics added.)

 *Cf., United States v. Treadway* (E.D.Va. 1970), 312 F.Supp. 307, where the trial court deferred ruling on a 'claim of double jeopardy until the record at trial was complete.

19. The danger to Government witnesses was vividly stated in the testimony of Carolyn House and in the statements given by Sonya Conyers to both Lieutenant Tomlin and to Assistant United States Attorney Brocato.

20. These cases are thoroughly analyzed in Note, *The Supreme Court, 1971 Term*, 86 Harv. L.Rev. 1 at 181 (1972); Note, *Compelled Testimony with Immunity: Applying the Standards of Use and Derivative Use*, 275 S.W.Law J. 517 (1973); Note, *The Scope of Testimonial Immunity under the Fifth Amendment: Kastigar v. United States*, 6 Loyola at L.A.Law Rev. 350 (1973); *The Fifth Amendment and Compelled Testimony: Practical Problems in the Wake of Kastigar*, 19 Villanova L.Rev. 470 (1974).

21. This distinction was recognized in the Organized Crime Control Act of 1970 and codified in 18 U.S.C. § 6002.

 *See*, U.S. Code Congress & Administrative News, 91st Congress, 2d Sess. (1970), pp. 4017–8, where, in explaining the section providing "the basic immunity from self-incrimination granting authorization," it was stated:

 " * * * This statutory immunity is intended to be as broad as, but no broader than, the privilege against self-incrimination. (See Senate hearings at p. 326.) It is designed to reflect the use-restriction immunity concept of *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) rather than the transaction immu-

"Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."[22]

In *Kastigar*, the Court added that the burden of proof required under *Murphy* "is not limited to a negation of taint; rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."[23] Moreover, the proscription of the statute extends not only to the compelled testimony itself but also to an "investigatory lead" provided by the compelled testimony and to "the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."[24]

■ The defendants do not contend that the trial court erred in its statement of the legal principles to be applied in passing on the motion; they rest their claim of error strictly on the findings of fact as made by the trial court. The factual findings made by the trial court, in applying the agreed legal principles, however, can only be disturbed if clearly erroneous. *United States v. Lawrenson* (4th Cir. 1962), 298 F.2d 880, 887, *cert. denied*, 370 U.S. 947, 82 S.Ct. 1594, 8 L.Ed.2d 812 (1962); *see, also, Jackson v. United States* (1965), 122 U.S.App.D.C. 324,

353 F.2d 862, 864–5. Such findings were not, in our opinion, clearly erroneous.

■ In reviewing the evidence on this phase of the appeal, it must be borne in mind that there were three investigations of the criminal activities of the Jones brothers going on simultaneously. One of these was being conducted by the Narcotics Unit of the Baltimore City police under the direction and control of Lieutenant Tomlin of that department. The other was under the direction and control of a special prosecutorial unit of the Baltimore District Attorney's office, known as the special Narcotics Strike Force, to which there was attached a small, select group of police officers under the command of Lieutenant Tabeling. Finally, there was the federal group, operating under the direction of Assistant United States Attorney Brocato, assisted by Agent Jacob of the Federal Bureau of Narcotics and Dangerous Drugs. The Narcotics Unit, under the direction of Lieutenant Tomlin, and the federal unit under Agent Jacob established a working relationship and an officer in Lieutenant Tomlin's unit, with a few supporting officers, were detailed to work with and to maintain liaison with the federal agents. No such relationship existed between the Strike Force and the federal agents of Mr. Brocato and there was no exchange of information or liaison of any kind between them. The Strike Force did receive information from Lieutenant Tomlin's group but it apparently did not pass on to the latter anything it developed in its

nity concept of *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892)."

22. 378 U.S. at 79, n. 18, 84 S.Ct. at 1609.

23. 406 U.S. at 460, 92 S.Ct. at 1665.

24. 406 U.S. at 460, 92 S.Ct. at 1665.
A number of commentators have recognized that "it is not all clear [from the decisions] whether absolutely all the evidence linked to a tainted source must be excluded or whether evidence which has become attenuated from the source of the primary taint may be admitted." 6 Loyola at L.A.L.Rev. at 376 and 19 Vill.L.Rev. at 487. *See, also*, 82 Yale L.J. at 177, n. 38.
In its exposition, the Court in *Kastigar* has likened the standards to be applied to those

applicable to coerced confessions. Thus, the commentator in 6 Loyola L.A.L.Rev. at 376, states that the clear inference of *Kastigar* "is that the Court intended the exclusionary rule to be applied similarly in both coerced confession cases and immunity cases, both of which deal with the privilege against self-incrimination." The editor in 82 Yale L.J. at 176–7, while recognizing the reasonableness of the inference, takes issue with the result. In any event, if the exclusionary rule in immunity cases is to be the same as in coerced confession cases, the attenuated principle, it would seem, should be applied. *See Harrison v. United States* (1968), 392 U.S. 219, 222–6, 88 S.Ct. 2008, 20 L.Ed.2d 1047, and *Wong Sun v. United States* (1963), 371 U.S. 471, 487–8, 83 S.Ct. 407, 9 L.Ed.2d 441.

investigation. It maintained no liaison of any kind with the federal authorities. In short, the Strike Force kept its information as developed in its investigation strictly within its own bosom, revealing it to neither of the other groups investigating the Jones brothers' narcotics activities.

And there was a very specific reason given by the chief attorney of the Strike Force for the guarded way in which it treated all information and leads developed by it in its investigation and for its action in keeping its distance from the federal investigation. The witness Dugan, who was the chief attorney of the Strike Force, testified that he was aware, through newspaper publicity and the return of indictments, of a federal investigation of the Jones brothers and their narcotics activities as well as of Lieutenant Tomlin's practice of "discussing various aspects of what he was doing with the Federal authorities." For that reason, he stated he told Tomlin, when he began to call witnesses before the grand jury and to grant immunity to some of these witnesses, that, in order "to avoid a taint" either of the Strike Force's proceedings or of the federal proceedings, their unit intended to "avoid any contact whatsoever" thereafter with either Lieutenant Tomlin or the federal authorities.[25] In keeping with this policy, the state grand jury transcript and the tapes of the testimony taken before the state grand jury were carefully guarded and secreted by the Strike Force. They were kept under strict "lock and key" and, with the exception of Lieutenant Tabeling, no police officer had access to those records. Lieutenant Tabeling did prepare a summary of the testimony for the use of the Strike Force attorneys but his use of the testimony was strictly supervised by Mr. Ward, who was in charge of the Strike Force. And Lieutenant Tabeling testified that he never discussed the grand jury testimony with anyone outside of the attorneys detailed to the Strike Force who were engaged in presenting the evidence before the state grand jury.

The federal authorities had little or no knowledge of the activities of the Strike Force. Agent Jacob never knew even that Robert Jones had been called by the Strike Force and had testified before the state grand jury until told of it on the eve of the suppression hearing itself. Mr. Brocato, who as Assistant United States Attorney headed the federal prosecution, said he heard the rumor but it was only a rumor that Robert Jones had testified in the state proceedings under immunity some months after the latter had so testified.[26] Neither had any information whatsoever as to what Robert Jones may have testified to before the state grand jury. And this was substantiated by persons connected with the Strike Force. Every individual connected with the Strike Force, called by the Government as a witness in the suppression hearing, testified he had communicated no information about Robert Jones' state grand jury testimony to any federal agent or representative or, for that matter, to any member of Lieutenant Tomlin's unit. Specifically, the state grand jury testimony of Robert Jones was never available to the federal authorities until during the trial in federal court and after the District Court had acquired from the State Court authority to break the seal on that record. This is accordingly quite a different case from *United States v. McDaniel, supra,* cited by the defendants, in which the federal prosecutor was furnished with a complete "three-

**25.** Prior to this Mr. Dugan had had many discussions with Lieutenant Tomlin and had received information from him. T., p. 371.

**26.** The danger of taint through exchange of information is always much less where two jurisdictions are involved, as here, rather than one. This was emphasized by Justice Brennan in his dissent in *Piccirillo v. New York* (1971), 400 U.S. 548 at 568, 91 S.Ct. 520 at 531, 27 L.Ed.2d 596:

" * * * This danger, substantial when a single jurisdiction both compels incriminating testimony and brings a later prosecution, may fade when the jurisdiction bringing the prosecution differs from the jurisdiction that compelled the testimony. Concern over informal and undetected exchange of information is also correspondingly less when two different jurisdictions are involved."

volume transcript" of the state grand jury testimony, including that of a federal defendant who, during his testimony, had made a full confession, "before the two federal indictments were handed down." [27] In short, the record shows, it would seem, conclusively that the federal authorities had no opportunity of access to Robert Jones' state grand jury testimony and no opportunity to make any use, direct or derivative of it.

Nor, for that matter, was there anything in Robert Jones' state grand jury testimony that would have provided any new information or "investigative leads" either to the state investigating units or the federal authorities. It is obvious from a reading of Robert Jones' testimony that he grudgingly provided only information which he knew was already available to the authorities. Most of his testimony was concerned with the source of his funds. The information for this examination was apparently secured from federal agents Wampler's and Cooper's investigations of the tax records of the Joneses. And this was information and material that was not injected into the federal prosecutions. Robert Jones did, it is true, admit knowledge of and a certain connection with an apartment on Ruxton Avenue in Baltimore where evidence at trial indicated the Joneses bagged the heroin they distributed. He, also, admitted that Sonya Conyers had been with him in a motel in suburban Baltimore. In admitting that he had been with Sonya Conyers in Baltimore and in admitting knowledge of the apartment on Ruxton Avenue, he was thus only admitting what he knew that the Strike Force already knew. He was giving no "leads"; he was providing no information that was not already known, in far greater detail, to Lieutenant Tomlin and his unit and, presumably, through Lieutenant Sallow, to Agent Jacob. Moreover, Carolyn House had already given the federal authorities a far more complete description of the bagging operation conducted by the Joneses at Ruxton Avenue than Sonya Conyers could. Carolyn House was one of those employed by the Joneses in bagging the heroin for sale. Through her and a certain notebook secured as a consequence of a federal search, Nelda Rogers, another employee in the bagging operation, had been identified. These were the witnesses on whom the Government based its primary evidence with reference to the operations at Ruxton Avenue. Both of these witnesses were developed by information entirely independent of anything revealed by Sonya Conyers. It is thus clear that Sonya Conyers was not a primary source—she wasn't really even a minimal source—of any information used by the Government, either directly or derivatively, in the development of its case.

Actually, Sonya Conyers, who the defendants claim was first identified as a "lead" in the investigation of the Jones network in Robert Jones' state grand jury investigation, and on whose information the defendants claim the Government built its case against the Joneses, was well known to Lieutenant Tomlin long before Robert Jones' grand jury appearance. Frightened by the Joneses, she had in September before Robert Jones' grand jury testimony in January, appealed for police protection and, in turn, had given a full story of her knowledge of the Joneses' operation to Lieutenant Tomlin. And it was unquestionably this information, transmitted by Lieutenant Tomlin to the Strike Force, which enabled Mr. Dugan, in his examination of Robert Jones, to "zero in" on places and events where Robert Jones had been with Sonya Conyers. The claim of the defendants that Sonya Conyers was exposed as a source only by the state grand jury testimony of Robert

**27.** 482 F.2d at 309 and 311.

See, to the same effect, *United States v. Dornau* (2d Cir. 1974), 491 F.2d 473, 476–7; but, *cf., United States v. Catalano* (2d Cir. 1974), 491 F.2d 268 at 272.

This case is similar to *United States v. Meyers* (E.D.Pa.1972), 339 F.Supp. 1154, 1160, where the Court, in denying a motion to dismiss, said:

"A transcript of the Hillsborough County Grand Jury testimony was never made public and there is no indication that federal authorities ever saw such a transcript."

Jones is without the slightest foundation in fact.[28]

■■■■ In summary, the Government, in its proof, not only showed that it had no access in any way to Robert Jones' grand jury testimony but also that it had made no use, direct or derivative, of Robert Jones' grand jury testimony. It successfully shouldered the "affirmative duty" imposed by *Kastigar* to establish that the evidence it did use was "derived from a legitimate source wholly independent of the compelled testimony."[29] The federal prosecutor, in his testimony at the suppression hearing took up each witness used by the Government and gave the basis on which the Government had been able to identify that witness and the manner in which it derived his or her testimony. The District Court did not err in denying the defendant Robert Jones' motion to suppress.

### Admissibility of Testimony of Co-conspirators.

■■■■ The verdict of the jury is assailed on the ground that impermissible hearsay of a prejudicial character was admitted at trial. The alleged impermissible hearsay consisted of statements made by declarants who, the Government contended, were participants in the criminal activity charged in the conspiracy indictment. The trial court admitted the statements on the ground that declarations and acts of a participant in a criminal conspiracy, made in connection with and during the currency of the conspiracy, are admissible, as a well-recognized exception to the hearsay rule.[30] The defendants do not take issue with this rule under which the trial court admitted the declarations, though one of the defendants does argue that the rule is only applicable where the declarant is a co-defendant, a contention conclusively rebuffed by the Court in *United States v. Nixon* (1974), 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039.[31] Nor do they argue that there was insufficient proof offered by the Government to support a prima facie finding of conspiracy in this case. What they do press—and this is the heart of their argument on this point—is the contention that, under this exception, no statement may be admitted unless there is sufficient credible evidence, independent of the hearsay, to warrant a finding that links the declarant to the criminal activity involved in the conspiracy, *see Glasser v. United States* (1942), 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, and that there was no such showing of connection on the part of the declarants whose statements they assert constituted inadmissible hearsay. In reply to this argument,

---

**28.** The defendants suggest that "possibly indirectly through informers", some information about Robert Jones' state grand jury testimony could have flowed through to the federal authorities. The members of the Strike Force denied positively that they had ever discussed Robert Jones' testimony with any informer, and the federal officers, as positively, denied they had received any information about Robert Jones' testimony from any informer. This argument of the defendants rests on no more than what Justice White dismissed as "remote and speculative possibilities," which the constitutional privilege does not protect against. *See* 378 U.S. at 102, 84 S.Ct. 1594.

**29.** 406 U.S. at 460, 92 S.Ct. at 1665.

**30.** *See United States v. Nixon* (1974), 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039; *Anderson v. United States* (1974), 417 U.S. 211, 221, 94 S.Ct. 2253, 41 L.Ed.2d 21; *Lutwak v. United States* (1953), 344 U.S. 604, 615–18, 73 S.Ct. 481, 97 L.Ed. 593; *Park v. Huff* (5th Cir. 1975), 506 F.2d 849, 858–9; *United States v. Griffin* (9th Cir. 1970), 434 F.2d 978, 983–4.

**31.** In fact, the indictment need not charge a conspiracy to make the exception applicable. *Dutton v. Evans* (1970), 400 U.S. 74, 83, 91 S.Ct. 210, 27 L.Ed.2d 213; *United States v. Everidge* (9th Cir. 1973), 488 F.2d 1, 3; *United States v. Williams* (9th Cir. 1970), 435 F.2d 642, 645; *United States v. Lev* (2d Cir. 1960) 276 F.2d 605, 608, *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); *United States v. Olweiss* (2d Cir. 1943), 138 F.2d 798, 800, *cert. denied,* 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944). In the last cited case, Judge Learned Hand said:

"The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal."

the Government conceded that, in order to render statements admissible under the exception, it had to make an independent showing "of likelihood of an illicit relationship between the declarant and the defendant * * *"[32] but it urges it made such a showing. The real controversy between the parties is accordingly whether the Government offered independent evidence of the declarant's connection with the criminal activity which was the object of the conspiracy sufficient to support a finding of joint undertaking or common activity so as to make the declarations admissible. This presented a question for determination by the trial court.[33]

The issue on this phase of the appeal is accordingly whether the trial court "had reasonable grounds" in holding that the Government sufficiently linked the declarants to the criminal activity stated in the indictment.[34] In making its determination, the trial court was permitted to rely in whole or in part on circumstantial evidence.[35] Nor is it necessary for its conclusion that the "showing of an illicit associ-

ation" go to the extent of meeting the test of the existence of the relationship "beyond a reasonable doubt:" It is authorized to rest its finding of such "illicit association" on " 'a fair preponderance of the [independent non-hearsay] evidence.' "[36] In fact, it has been held that in some cases "slight evidence" may be sufficient to meet this requirement of a "fair preponderance."[37] The evidence considered by the trial court would be sufficient under this requirement, for instance, if a knowing assistance of any kind in effectuating the objective of the criminal activity were shown,[38] or its conclusion could rest on evidence establishing the possession and transportation of the subject matter of the illicit transaction.[39] Applying these principles, we shall consider the connection of the several declarants who the defendants argue were not linked, and the Government contends were linked, to the conspiracy in order to determine the admissibility of their statements.

The defendants cite initially the testimony of one Andre Brown as illustrative of an instance where declarations of

---

**32.** The leading case of *United States v. Ragland* (2d Cir. 1967), 375 F.2d 471, 476–7, *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), described this requirement as one involving "a showing of a likelihood of an illicit association between the declarant and the defendant * * *."

**33.** *See Carbo v. United States* (9th Cir. 1963), 314 F.2d 718, 737, *cert. denied,* 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964), *reh. denied,* 377 U.S. 1010, 84 S.Ct. 1902, 1903, 12 L.Ed.2d 1058 (1964):
> "It is for the judge then, and not the jury, to determine the admissibility of the declarations. In making this determination the test is not whether the defendants' connection had by independent evidence been proved beyond a reasonable doubt, but whether, accepting the independent evidence as credible, the judge is satisfied that a prima facie case (one which would support a finding) has been made. Thereafter it is the jury's function to determine whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt."

**34.** *United States v. Geaney* (2d Cir. 1969), 417 F.2d 1116, 1120, *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

**35.** *United States v. Manfredi* (2d Cir. 1973), 488 F.2d 588, 596, *cert. denied,* 417 U.S. 936, 94

S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Calabro* (2d Cir. 1971), 449 F.2d 885, 890, *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). In the latter case, the Court said: " 'Pieces of evidence must be viewed not in isolation but in conjunction.' " (Quoting Judge Friendly in *United States v. Geaney,* 417 F.2d at 1121).

**36.** *United States v. Wiley* (2d Cir. 1975), 519 F.2d 1348, 1350; *United States v. James* (5th Cir. 1975), 510 F.2d 546, 549.

**37.** *United States v. Lee* (5th Cir. 1973), 483 F.2d 968, 969. *But, cf., United States v. Wiley, supra* (519 F.2d at 1350); *Park v. Huff, supra* (506 F.2d at 859); *United States v. DeLazo* (3d Cir. 1974), 497 F.2d 1168, 1170. For an instance of such evidence, *see United States v. Manfredi, supra* (488 F.2d at 596).

**38.** *United States v. Wiley, supra* (519 F.2d at 1350); *United States v. James, supra* (510 F.2d at 549).

**39.** *See, also, United States v. Kaplan* (2d Cir. 1974), 510 F.2d 606, 610 and 612, and *United States v. D'Amato* (2d Cir. 1974), 493 F.2d 359, 365, *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d (1974).

one not "linked" to the conspiracy were improperly admitted and thus not admissible under *Glasser.*[40] They assert categorically that, "at no time was there offered during the trial of this case any independent evidence that Andre Brown was part of a conspiracy" and add that the only evidence with reference to Andre Brown was supplied by Ronnie Smith. Contrary to this statement, the record includes ample evidence, apart from any questionable hearsay testimony which fully satisfies the requirement of *Lutwak*[41] for establishing Andre Brown's involvement in the conspiracy to distribute narcotics; and that evidence is not confined to the testimony of Ronnie Smith, though Smith's testimony is corroborative of Andre Brown's "link" to the criminal activity in question. Jesse Parker, whose connection with the conspiracy and with the Jones defendants is well developed in the record, testified that Andre Brown was a member of his group in the Jones network, engaged in the distribution of the narcotics. Ronnie Smith was working for Parker at the same time in a similar capacity to that of Andre Brown. Smith corroborated Parker in this testimony that Brown was distributing heroin under Parker during the currency of the conspiracy. This evidence, which represented direct testimony of participation and involved no hearsay, provided a sufficient linkage of Brown to the conspiracy. It is thus inaccurate to declare that there was not credible evidence, apart from any objectionable hearsay, to show Andre Brown's "link" to the conspiracy and to provide a proper basis for the admission of his declaration made during the pendency of the conspiracy to one commonly engaged with him in the activities of the conspiracy. It should be added, too, that Parker also testified, *and without objection,* that there came a time later when Andre Brown moved up in the organization and began to work directly under

"Liddie."[42] Andre Brown later confirmed this arrangement with Liddie in a statement to Ronnie Smith to the effect that he was now "working for Liddie" and had "stopped working for him" [meaning Parker]. It is apparently this testimony which the defendants find objectionable and to which their claim of error is directed. This declaration was, however, plainly admissible as a statement by one already shown by Jesse Parker's testimony to have been engaged in the distribution of heroin as a part of the Jones distribution operation. Moreover, it did no more than confirm what had already been testified to by Parker without objection with reference to a change in Brown's status with the Jones organization. Even if this statement could have been regarded as impermissible hearsay, its admission after Parker's testimony would have been harmless and would afford no basis for reversal.[43]

■■■ Similarly, the defendants argue that there was no evidence linking Ludell Higgins, Cecil Key, or the "Chinaman" (Charles Kennedy) to the alleged conspiracy and that any declarations by them admitted in evidence constituted for this reason objectionable hearsay. The record clearly refutes the claim. Parker, who testified he acquired drugs from Liddie on consignment and made payment to him on that account, testified that Liddie told him that if he wanted more drugs on consignment, he "could get a package from Chinaman or Cecil Key." What the defendant John Edward Jones told Parker would plainly not have been impermissible hearsay. Parker further testified that, on another occasion, when he had gone to Liddie for drugs to distribute, Liddie "got up and called Cecil and Ludell and we got our package." Higgins, Key and the Chinaman were thus linked to the conspiracy and shown to be "participants in a common criminal enterprise," both by the acts and by the declara-

**40.** 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

**41.** 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593.

**42.** Because the defendant John Edward Jones, the "kingpin" in the criminal activity, is generally referred to as "Liddie" in the testimony, we shall refer hereafter sometimes to him as "Liddie" just as many of the witnesses did.

**43.** *See Lutwak v. United States, supra,* 344 U.S. at 619–20, 73 S.Ct. 481.

tions of the major defendant and the "king-pin" in the alleged conspiracy, Liddie.[44]

■ The defendants also argue that statements by Deep Blue (Charles Marks) and David Ross, admitted during the presentation of the Government's case, were received "without [the Government] ever submitting independent evidence of their association with an alleged conspiracy." Evidence of Deep Blue's involvement is clearly established. Both Parker and Whiting definitely fixed his intimate connection with the conspiracy. When Parker initially approached Liddie in order to secure drugs to sell on consignment, Liddie told him that he didn't have any then but would "see [him] in a week or so." About a week later Parker was approached by Deep Blue, who delivered to him a package of drugs to distribute, saying "Liddie had okayed a package for me." Under the arrangement, Parker was to pay Deep Blue after he made distribution. This arrangement under which Deep Blue was the "bag man" was confirmed by Ronnie Smith, who testified without objection that Parker got "his stuff" from Deep Blue and that they were often seen together. The testimony of Reece Whiting strengthens and makes crystal clear Deep Blue's intimate involvement in the narcotics operation of the Joneses. This testimony began with Whiting's employment by Liddie to make a pick-up of drugs in New York. Liddie told him when he was so employed, that Deep Blue would accept delivery of the drugs on behalf of Liddie. Deep Blue, however, had automobile trouble and did not reach New York to take delivery there but when Whiting returned to Baltimore and reported to Liddie, he was instructed by Liddie to turn the narcotics over to Deep Blue. Later in January, 1972 the defendant Robert Jones told Whiting that Deep Blue, who had been collecting from distributors for the Joneses was "hot" and arrangements had to be made to replace him. Whiting was offered Deep Blue's position and accepted. He tes-

tified that his collections, after he replaced Deep Blue ran from $20,000 to $30,000 per week. Thereafter Liddie, Deep Blue and Whiting visited the parties who had been receiving their narcotics and made their accounting for drug sales to Deep Blue. One of those so visited was Jesse Parker. Parker was told by Deep Blue in Liddie's presence that the method of doing business had changed and that he [Parker] was thereafter to get his drugs from and account to Whiting. Liddie followed up this statement of Deep Blue's by explaining "the responsibility of accepting drugs." Liddie specifically told Parker that if any of those working for Parker were apprehended, Liddie " wouldn't be responsible for them" but if he [Parker] got "knocked off" he would be "gotten out on bail and it would be paid for." Deep Blue was thus effectively tied in to the conspiracy and by evidence apart from any impermissible hearsay.[45]

■ Raymond Jefferson was identified by both Nelda Rogers and Carolyn House as associated in the Jones network. Carolyn House testified that, while she was employed by the Jones brothers to bag heroin for them, Raymond Jefferson was a distributor to whom bagged heroin would be delivered and he [meaning Jefferson] would "take them out and distribute them." David Ross, in turn, was identified by Jesse Parker as one of those in his unit who distributed heroin on behalf of the Jones organization. This was direct evidence of acts done by both Jefferson and Ross as incidents in the distribution set-up utilized by the Joneses in their operation. The connection of Jefferson and Ross with the conspiracy rests not on hearsay but on independent evidence.

■ The defendants particularly single out the testimony of Robert Addison as evidencing what they characterize as "[T]he most blatant violation" of the hearsay rule.

**44.** *United States v. Grant* (5th Cir. 1975), 519 F.2d 64, 66.

**45.** Jesse Parker, also, identified David Ross as one of his distributors and thereby provided evidence of the latter's participation in the distribution carried on by the Jones group.

In his direct testimony, however, Addison testified to but three conversations. The only one of such conversations to which the defendants objected at trial was one between Liddie, the major conspirator, and Herman Buckman. Addison did not hear all this conversation between Liddie and Buckman and he testified merely to the part he overheard. The defendants did not object to what Addison heard Liddie say during this conversation, only to what Buckman was heard to say. But Buckman's part of the conversation was brief and, standing alone, unimportant; the real prejudice and materiality was in what Liddie said, the very part of the conversation to which the defendants did not object. According to Addison, he heard Liddie say to Buckman, "no, I'll give you one." Buckman replied, "okay." Thereupon Liddie "turned to another person and told him to give him one bundle." That conversation was clearly admissible as the statement of a co-conspirator; and in no way justifies the characterization of a "blatant violation" of the hearsay rule.

■ The defendants ask that "specific attention" be given to the testimony of Robert Addison with reference to Larry Franklin, the Chinaman (Charles Kennedy), Helen Skillings, Ludell Higgins and Annette Parker. So far as we can ascertain there is no reference to Larry Franklin in the indicated part of the trial transcript. All that Addison testified to about the "Chinaman" was that Liddie knew the "Chinaman." He testified to this as a matter of personal knowledge and not on the basis of hearsay. In fact, the prosecutor instructed Addison specifically not to volunteer hearsay. Similarly, he said Helen Skillings knew Liddie Jones. This, again, was based on personal knowledge and not hearsay. Moreover, there was other testimony that Helen Skillings had been seen on a number of occasions riding around with Liddie; and when Helen was arrested, Liddie arranged her bond, describing her as his "girl friend." Addison did state that Skillings, Higgins and Parker sold "dope." But this testimony did not rest on hearsay. Addison testified that this testimony was based on the fact

that he had bought drugs from them. Clearly, none of this will support a claim that impermissible hearsay was admitted during the testimony of Robert Addison.

■ Some objection was made during oral argument, though not in the written briefs, to the testimony of the witness Walter Watkins as tainted hearsay. Watkins was a reluctant witness who sought to recant much of the testimony given by him before the grand jury. He did testify, however, to an approach he and his girl friend made to Liddie for the purpose of securing narcotics to sell. The approach was made in a bar, while Liddie, Watkins and Watkins' girl friend were seated together at a table. Watkins in his court testimony said Liddie made no reply when the request was made but got up from the table and walked away. Within five minutes, however, another person identified as Bobby Crawley, came over, "sat down at the table" with Watkins and his girl friend, and proceeded to ask Watkins if he were known as "Fat." Crawley had never seen Watkins before and normally would not have known Watkins' nickname. Liddie did, however, know Watkins as "Fat;" in fact, the two of them had grown up together and had known each other for years. When Watkins admitted that he was known generally as "Fat," Crawley immediately inquired "how much could I [Watkins] handle?" Watkins replied that he could handle "as much as you give me." At that point, Crawley told Watkins and his girl friend to follow him. The group went out, got in Crawley's car, drove to a spot, where they met another individual known as "Hog" in a Ford Thunderbird car. Watkins was instructed by Crawley to go over to the Ford car, which he did. He got into the car and was given by the driver of the car five bundles of heroin for sale. Presumably, the defendants objected to such parts of this testimony as consisted of statements by Crawley, whose connection with the alleged conspiracy they urge was not sufficiently indicated in the evidence. This argument overlooks the positive testimony of Nelda Rogers and Carolyn House, which effectively established Crawley's inti-

mate relationship with the Jones narcotics operation. The connection between Crawley and Liddie was further indicated by the circumstances surrounding the transaction between Crawley and Watkins. The defendants can hardly deny the significance of the fact that, within a few minutes after Liddie and Watkins had discussed the possibility of the latter selling heroin for Liddie, Crawley, a complete stranger to Watkins, approaches Watkins. Crawley had apparently been given by someone a means of identifying Watkins before engaging in any negotiations with him. This method of identification consisted of the nickname "Fat." Watkins had never seen Crawley before. Some one had to have alerted him and made available to him this means of identification of Watkins. Every indication pointed to Liddie as the source of Watkins' nickname. Immediately after identifying Watkins as "Fat" and without further ado or inquiry, Crawley inquired how much heroin could Watkins handle. Unquestionably some one, too, had to tip Crawley off that Watkins was interested in becoming a seller of heroin before Crawley approached Watkins. Again, everything pointed to Liddie as this source. All these circumstances join up to provide a reasonable basis for finding that Crawley was acting for Liddie and was a participant in the narcotics operation. Additional support for Crawley's connection with Liddie was provided by his conduct after he was arrested for narcotics violation. He directed the person he was using as his bail bondsman to communicate with Liddie, who did participate in paying part of the premium on Crawley's bond. Watkins' link to the conspiracy and to Liddie was thus established by evidence apart from hearsay; it is of no moment it was circumstantial rather than direct.

■■■■■ Finally, the defendants, without directing our attention to any specific parts of their testimony, point generally to the testimony of Reece Whiting, Walker Mitchell, John Hailey and Norman Coleman as tainted with impermissible hearsay. They excuse any specification of the objectionable testimony itself with the statement that "[T]he actual text [where the objectionable testimony is to be found] consists of hundreds of pages of transcript." We are left, therefore, to search through the testimony and to seek to discover whether there was any objectionable hearsay in this mass of testimony.[46] A review of Reece Whiting's testimony, some of which has already been detailed, reveals a considerable number of conversations with one or more of the Joneses, but, since they are charged and established *prima facie* as coconspirators, there could be no objection to the admission of such evidence. The only conversation recounted by him other than with one of the defendants themselves was with Deep Blue, to which we have already referred. We find nothing objectionable here. Certainly, it cannot be said that both Whiting and Deep Blue were not intimate participants in the Jones operation. Whiting purchased narcotics for the Jones defendants in New York, and he made two trips at least to the West Coast to purchase drugs for them, being entrusted by them on one occasion with $60,000 for the purpose and with $40,000 on the second. The declarations of these two participants made while both were engaged in the narcotics operations were admissible. Hailey, another of those whose testimony is challenged by the defendants, was a police officer. He related during his testimony conversations he had had with Cecil Key, Ludell Higgins and Ronnie Smith. His testimony occurred in the early stages of the trial, when not all these parties had been linked with the conspiracy. The trial court, however, in its discretion permitted the introduction of his testimony subject to the declarants being later linked to the conspiracy.[47] As we

---

**46.** When an appellant makes no effort to indicate specifically in the record the particular evidence to which he objected and on the basis of which he seeks reversal, it is entirely proper for the Court to disregard such claim of error. In this case, however, we have not disregarded the claim but have carefully combed through the record.

**47.** This is not an unusual practice in conspiracy prosecutions and has been repeatedly approved. *Esco Corporation v. United States*

have already pointed out, all these parties, with whom Hailey talked and whose conversations he related, were later linked to the conspiracy by proof not based on hearsay. This removed any infirmity in Hailey's testimony. Norman Coleman, just as Whiting, testified basically to conversations he had with the defendant Liddie. He did refer briefly to some statements of Deep Blue and Jefferson. The defendants concede substantially that Jefferson was identified with their activity and we have already pointed out the mass of testimony involving Deep Blue with it. Walker Mitchell, the last one named in this broad specification, was identified as one of the Jones' distributors, participating actively in the narcotics operation.

To sum up, we have reviewed painstakingly and we think exhaustively the record and we have found no prejudicial hearsay.

*Prejudice in Manner of Interviews of Government's Witnesses as Allowed by Trial Court.*

Another ground urged by the defendants revolves about the manner in which they were allegedly restricted in their interviews of the prosecution witnesses. These restrictions, they assert, prejudiced them in the presentation of their defense. The record shows that early in the prosecution the defendants filed a motion to be allowed "to privately interview, in advance of trial and subject to appropriate protective order of [the] Court, the witnesses in this case known to the Government." In its reply to this motion, filed promptly after the filing of the motion, the Government countered with an offer to provide a list of such witnesses "with the undertaking by the Government to grant defense counsel access

to Government witnesses on the day prior to the day they are scheduled to testify." This concession by the Government, it would seem, was acceptable to the defendants, for the record reflects no attempt thereafter by the defendants to press their motion. The agreement to permit interviews by the defendants' counsel of the Government's witnesses obviously would relate only to those witnesses in Government custody, since all other witnesses, the names of whom were made available to the defendants, were equally available to the defense and the prosecution. And it would seem that, even in the case of witnesses in custody, the Government did not prevent or frustrate defense counsel in any way from interviewing such witnesses even before trial.[48] This is evident from defense counsel's statement about the prosecution witness Nelda Rogers, whom the defense was unable to interview before she was called as a witness and who was in custody. The defense conceded that the Government had "technically made her [i. e., Nelda Rogers] available to us [but] her attorney, Mr. Charles B. Howard, as he previously indicated at the bench, did not permit her to talk to us." Also, the record suggests that, even in the case of witnesses not in custody, the Government made these witnesses available for interview by the defense prior to such witnesses being called to testify.

These interviews of the Government witnesses by defendants' counsel were private until some "untoward" incident occurred, the exact nature of which is not revealed in the record but apparently of such seriousness that, without objection at that point by the defendants, subsequent interviews were carried out with a representative of the prosecutor's staff present. Objection to this procedure was voiced by the defense

(9th Cir. 1965), 340 F.2d 1000, 1009–10; *United States v. Sansone* (2d Cir. 1956), 231 F.2d 887, 893, *cert. denied,* 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956).

**48.** This case is thus unlike *Gregory v. United States* (1969), 133 U.S.App.D.C. 317, 410 F.2d 1016, *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969). *See, also,* § 3.1(c) ABA

Project on Standards for Criminal Justice (1974):

"A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. It is unprofessional conduct for the prosecutor to advise any person or cause any person to be advised to decline to give to the defense information which he has the right to give."

*only* at the conclusion of the direct testimony of Nelda Rogers and was repeated at the completion of Carolyn House's direct testimony. This objection based on a denial of a prior right to interview Government witnesses thus concerns, it would seem, only these two witnesses and their testimony.

Both Nelda Rogers and Carolyn House were reluctant witnesses. Neither testified willingly and both sought to avoid any interviews by either the Government or the defense after their grand jury testimony. Both employed counsel to represent them in frustrating any attempt by either side to interview them. Carolyn House was first called as a witness and, upon her refusal to testify, was cited in contempt. After she was committed for contempt she sought to purge her contempt by testifying. When advised of her willingness to testify, the Government promptly called her as a witness without any prior interview of her on the part of the prosecutor, though it seems an investigator for the Government did, in company with her lawyer, have a few minutes with her before she was sworn. Similarly, Nelda Rogers was called without any prior interview by the prosecutor. Though called after Carolyn House, she actually testified before Mrs. House consented to testify. When she was called, the defense asked that her testimony be delayed until they had an opportunity to interview her. The trial judge ruled that he would proceed with the direct examination and defer any decision on the right to interview until after the completion of that examination. At the conclusion of the direct examination, the defense renewed the request to defer cross-examination until they could interview the witness. Preliminary to ruling on that motion, the Court inquired what information from the witness had been made available to the defense by the Government. The Government replied that the grand

jury testimony of the witness had been made available to the defense. At this point, the defense requested the right to interview Mrs. Rogers without the prosecutor being present. To that request, the Court responded that neither the Government nor defense counsel would be permitted to interview the witness without the presence of opposing counsel. A similar ruling was made at the conclusion of Mrs. House's direct testimony. It is apparently this ruling to which the claim of error is directed.

Whether the trial judge should have deferred the testimony of the two witnesses and should have allowed private interviews of them before cross-examination is a question of some difficulty. The witnesses in question were reluctant to testify. To have delayed the taking of their testimony until later could possibly have resulted in the loss of their testimony altogether. Moreover, the request for a private interview was not made until after the witness had given her direct testimony. Some courts have recognized that at such a stage it is discretionary with the trial judge to deny any right of interview by either prosecution or defense in the absence of the other counsel.[49] We find it unnecessary to determine this issue, though we do note that there were unusual circumstances in this case. Mrs. House originally refused to testify because of fear for the safety of herself and her children. It is inferable that similar circumstances may have influenced Mrs. Rogers. It is possible, however, that, if these considerations prompted the trial judge's ruling, he could have guarded against the dangers of coercion or intimidation by some more acceptable method than requiring the presence of opposing counsel.[50] But, as we have said, we find no reason to determine this issue, since the defense, in our judgment suffered no real prejudice, and, under those

**49.** *Cf., Emmett v. State* (1974), 232 Ga. 110, 205 S.E.2d 231, 239 (sustaining ruling restricting right of all counsel to interview witness at completion of witness' direct testimony); *State v. Reichenberger* (1970), 289 Minn. 75, 182 N.W.2d 692, 695–6.

**50.** In similar circumstances, some courts have upheld the presence of an officer to be present at interview to guard against coercion or intimidation. *See Atkins v. State* (1927), 115 Ohio St. 542, 155 N.E. 189, 191; *Cannon v. State* (Miss.1966), 190 So.2d 848, 850.

circumstances, the error, if any, was harmless.[51]

■ Certainly, there was no real prejudice to the defense in the refusal to permit private interviews of Mrs. Rogers and Mrs. House after their direct testimony. Contrary to defense contentions, these witnesses were not unknown to the defense nor was the defense unaware that they were potential witnesses. Mrs. Rogers, when the Government was seeking her testimony in this case in advance of her appearance before the grand jury, retained one of the counsel appearing in this case on behalf of the defendant John Edward Jones, presumably to advise her and to enable her to avoid testifying. It is disingenuous for such counsel to plead unawareness of Mrs. Rogers as a potential witness or even that he was ignorant altogether of her connection with the case.

Moreover, counsel conceded that they had sought earlier to interview Mrs. Rogers and had been denied that right, not by the prosecutor, but by the witness herself, acting upon the advice of her new counsel. Both of these witnesses, also testified before the grand jury. That testimony was made available to the defense. It is not suggested that at trial the witnesses varied or enlarged upon their testimony as given before the grand jury. The defense, supplied with this grand jury testimony, could hardly support their claim that they were in the dark as to the direction of these witnesses' testimony "until (1) her direct examination and (2) our interview after her direct examination." Nor is there any substance to

their contention that "as a result of the conversation we had with her [i. e., with Nelda Rogers] last night," we need an opportunity in her case to pursue "certain leads" relating (1) to the status of her drug withdrawal program, (2) where the three Joneses were at the times Mrs. Rogers testified she had observed their actions, and (3) whether she had had a difficulty with another individual. So far as the second fact was concerned, that was a matter within the peculiar knowledge of the defendants themselves. The other two "leads" were covered thoroughly in Mrs. Rogers' extensive cross-examination. She made no effort to conceal her drug addiction or her participation in a drug withdrawal program. The accuracy of her testimony in this particular was never questioned by any subsequent testimony, though the defense had ample time to investigate this aspect of her testimony and to contradict her, if there was any basis for such contradiction. She, also, denied having any difficulty with Mary Epps. Mary Epps was the sister of the defendants and was available to the defendants. It is significant that the defense did not call Mrs. Epps as a witness to contradict Mrs. Rogers.

The grand jury testimony, the interviews—even with the prosecutors present—and the extensive cross-examination by counsel for each defendant eliminated any prejudice that might have resulted from a denial of prior access to these witnesses by the defense. And the defendants seemingly recognize this, for, in their appeal to this court, they make no claim of actual preju-

---

**51.** *United States v. Murray* (9th Cir. 1973), 492 F.2d 178, 195, *cert. denied*, 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 86 (1974); *United States v. Long* (9th Cir. 1971), 449 F.2d 288, 296, *cert. denied*, 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 247 (1972); *Johnson v. State* (1973), 18 Md. App. 571, 308 A.2d 426, 429; *see*, Annotation 14 A.L.R.3d 652 and in particular at 663; *Atkins v. State, supra* (155 N.E. at 191); *People v. Clark* (1973), 9 Ill.App.3d 998, 293 N.E.2d 666, 668; *Whitehead v. State* (1938), 134 Tex.Cr.R. 579, 116 S.W.2d 703, 705–6; *State v. Lerner* (1973), 112 R.I. 62, 308 A.2d 324, 335; *State v. Gaines* (1927), 144 Wash. 446, 258 P. 508, 511; *contra, Commonwealth v. Balliro* (1965), 349 Mass. 505, 209 N.E.2d 308.

In *Long*, the Court said (449 F.2d at 296): "From an examination of the entire record, we are, however, convinced that any error of the trial court here in failing to make Mr. Neal available was harmless error, especially in view of the extensive cross-examination of Neal by the attorneys for the defense, both in the presence and outside the presence of the jury." In *Lerner* (308 A.2d at 335), the Court said that, while the right of the defense to interview the prosecution's witnesses was "of constitutional dimensions," it was not "so basic to a fair and impartial trial that its infraction can never be treated as harmless error."

dice and we can find none. This contention is therefore rejected.

■ The defendants add, as a postscript to this contention, that the conduct of the Government in interviewing, without the knowledge or presence of the defense, a potential witness for the defense was in striking contrast with that allowed by the trial judge in connection with interviews by the defense of potential Government witnesses. The so-called "potential witness" for the defense was John A. Adams. He was called as a witness for the defense. After he was sworn and had identified himself as an inmate of the Maryland Penitentiary under a seven-year sentence on a multiple of convictions, the defense suddenly announced that "the subject matter that I was going to ask Mr. Adams would be inadmissible" and apologized to the Court for calling him as a witness. Mr. Adams was thereupon excused as a witness and released to the Marshal for return to the Maryland Penitentiary. Understandably, the prosecutor's curiosity was piqued by this unusual turn of events and, before the Marshal could return Mr. Adams to the Penitentiary, interviewed him to ascertain what he knew, if anything, about the case. Mr. Adams professed in this interview ignorance of anything connected with the case. This was the interview—an interview had only after Mr. Adams had been released as a witness both by the defense and the Court—that is the basis for this argument. While it no doubt would have been better had the prosecutor not interviewed Mr. Adams after he had been released as a witness by the defense, we see no prejudice to the defense in the action of the prosecutor and are not disposed to order a new trial on this account. Adams professed to no knowledge of any involvement of the Joneses in the drug traffic. He was not swayed in any way by any action of the prosecutor. Accepting as true his testimony, Adams had nothing to contribute on behalf of either the defense or the prosecution and it is understandable that the defense released him. While we find no prejudice in the action of the prosecutor in this regard, we would not be understood as completely approving his conduct.

*Jury Taint*

■ The defendants, also, raise the probability of jury contamination as a result of an episode involving a conversation among two jurors and an alternate juror. While riding on the bus to court during the trial, the alternate juror inquired of the two jurors whether the latter had observed that an attorney for one of the defendants was no longer appearing at the trial. She added that the attorney had been "jailed" for contempt in another case by a different court. This attorney later testified as a witness for the defendants. Of course, he could not have testified without withdrawing as counsel. His testimony, though, was of inconsequential importance and was not contradicted. There is no reason to assume that this statement by the alternate juror could have impaired the credibility of the witness, and, even had it done so, the relative unimportance of the witness' testimony would have made such impairment too insubstantial in any event to require a new trial. After all, "[A] new trial [in these circumstances] should be ordered only when *substantial* prejudice has occurred."[52]

Moreover, when examined by the trial court, the two jurors,[53] testified that they had told no other member of the jury about the conversation but did feel they should report it to the court. They added that the conversation would have no effect on their actions as jurors and that they felt that they could render a fair and impartial verdict. As said, we see nothing in the incident to require a new trial.

■ There was another incident which constituted, the defendants urged,

---

**52.** *United States v. Armocida* (3d Cir. 1975), 515 F.2d 29, 49 (Italics in opinion). To the same effect: *United States v. D'Andrea* (3d Cir. 1974), 495 F.2d 1170, 1172–3, *cert. denied*, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974).

**53.** The alternate juror was not examined because it was apparent to the trial court she would not sit on the jury.

jury contamination and which they suggest required a mistrial. According to the juror's account of the incident, which apparently the trial court accepted, a juror was leaving the court after adjournment and encountered a Ms. Jones, who, after ascertaining the juror was on a jury, inquired whether he was a juror in the Liddie Jones trial. When the juror replied in the affirmative, Ms. Jones commented somewhat to the effect, "[W]hat a terrific guy Mr. Miles is" or "what a nice guy he was" and referred to the fact that she had formerly worked for Mr. Miles. At this point there is some divergency in the recollections of the juror and Ms. Jones. According to the latter, the juror referred to Mr. Miles as "cocky;" the juror's recollection was that he merely said that Mr. Miles did "a few things that I personally, subjectively, find a little ludicrous." There was no comment during the conversation on the case itself, on any of the evidence that had been adduced or on the possible guilt or innocence of the defendants. The juror stated unequivocally that the conversation did not in any way affect his ability "to render a fair and impartial verdict solely on the law and the evidence." We apprehend no basis here for a mistrial, action which is only to be taken for a cause that presents substantial prejudice.[54]

### Ex Parte Examination of Jurors

■ The trial judge, when information came to him relative to possible exposure of jurors to prejudicial publicity or taint during trial, conducted in camera examinations under oath of the jurors with counsel both for the Government and the defendants absent. The defendants claim error in this. Before the trial court conducted its examinations, there was some discussion about the procedure to be followed. The first claim of jury taint or exposure arose in connection with the juror Bognanni, who had the slight conversation with Ms. Jones to which reference has been made. That

conversation was apparently brought to the attention of the trial court by counsel for the defendants, who requested that the juror be examined by the trial judge. One of defendants' counsel, speaking for all counsel, at that point suggested that the procedure could "take one or two directions * * * either an in camera conference * * * or that he be brought to the bench, or in your chambers, something of that nature, and questioned by all counsel and the Court."[55] It is plain then that not only was counsel aware that the trial judge might examine the challenged jurors in camera; counsel for defendants actually seem to have been suggesting this as one of two acceptable procedures to be followed by the trial judge. It is understandable, therefore, that, in beginning the examinations, the trial court would state as it did into the record that the in camera examinations were being "done with the knowledge of the attorneys." It could have added that it was proceeding not only with their knowledge but also in accordance with their suggested procedure. Moreover, the record of the examinations was made available to counsel after the in camera examinations. None of counsel took exception to the procedure followed or sought any correction therein including the statement that the court was acting with the knowledge of all counsel, or made any motion of any kind. It is apparent that counsel for the defendants were certainly apprised of the procedure followed by the trial court immediately after it had examined the jurors, made no objection to the procedure which they had actually suggested and unquestionably acquiesced in. Since, in conducting the in camera examinations, the trial judge was merely adopting a procedure suggested to him by counsel for the defendants, it hardly requires discussion that the defendants will not be heard to complain that examinations were conducted in camera without the presence of their counsel.[56]

---

**54.** See United States v. Peterson (4th Cir. 1975), 524 F.2d 167, 176–7; United States v. Anderson, supra.

**55.** Trial Transcript p. 2439.

**56.** Cf. United States v. Lewis (5th Cir. 1975), 524 F.2d 991, 992:

■ Even had counsel for the defendants not suggested and, by implication at least, agreed to the procedure followed by the trial court, the very fact that counsel for the defendants knew of the procedure, and neither before nor after the examinations were completed, objected would amount under the authorities to a waiver of any claim of error in regard to the *in camera* examination in the absence of a showing of prejudice. In *United States v. Larkin* (1st Cir. 1969), 417 F.2d 617, *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1271, 25 L.Ed.2d 536 (1970), for instance, the trial court, after being informed of possible contamination of the jury, proceeded to interrogate *in camera* the jurors. After completing the examination, he "then summoned counsel, related the gist of its interviews, and found that the incidents had in no way prejudiced any juror against the defendant." [57] No objection at this time was raised by counsel for the defendant to the fact that they had not been invited to be present at the *in camera* examination of the jurors. In finding no error in the action of the trial judge, the court said:

"Had defendant been unaware of the court's interviews with the jurors [citing cases], or had the court's action infringed on a specific constitutional guarantee, such as the right of confrontation, we would feel obliged to apply the stricter test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) in determining prejudice. When, however, the trial court exercises its discretion to safeguard defendant's rights in a matter collateral to the main issues at trial, and defendant acquiesces, we think defendant must make some plain showing of preju-

dice to justify reversal * * *." (417 F.2d at 619, n.*)

Again, in *United States v. Doe* (1st Cir. 1975), 513 F.2d 709, a question of possible jury contamination arose, and the trial judge examined *in camera* the juror concerned without the presence of the defendant's counsel. In finding no error, the court declared:

"If, as it appears, this was an ex parte interview [by the trial judge], without the presence of defense counsel, the latter knew of the incident and raised no objections at any time. As we said of a similar situation in *United States v. Larkin,* 417 F.2d 617, 619 (1969), this is 'at best harmless error'." (513 F.2d at 710, n.1)

In *United States v. Jorgenson* (10th Cir. 1972), 451 F.2d 516, *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972), a bench conference between the trial judge and one of the jurors occurred. This conference was "held out of the presence of the defendants and defense counsel. In subsequent discussions immediately afterward, however, the entire conversation was read by the reporter." [58] Later, the defendants appealed because of this conference between the trial judge and juror. In denying relief, the court said:

"Any inherent prejudice was obviated by the court reporter's reading of the entire conversation to counsel and defendants. Ample opportunity was afforded for anyone who felt prejudiced thereby to object." (451 F.2d at 521) [59]

■ There is no showing of prejudice in this case. Error, if there was, in the *in camera* examination would be "harmless error" under *United States v. Doe, supra.* This, of course, does not mean that we

---

"A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby."

**57.** 417 F.2d at 618.

**58.** 451 F.2d at 520.

**59.** *See, also, Howard v. Kentucky* (1906), 200 U.S. 164, 173, 26 S.Ct. 189, 50 L.Ed. 421; *United States v. Burke* (9th Cir. 1975), 506 F.2d

1165, 1170, *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781; *United States v. Crisona* (2d Cir. 1969), 416 F.2d 107, 119, *cert. denied,* 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970); *Allen v. United States* (E.D.Pa.1974), 376 F.Supp. 1386, 1389. *Cf., United States v. Rocks* (4th Cir. 1973), 481 F.2d 112, *cert. denied,* 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973) *reh. denied,* 414 U.S. 1148, 94 S.Ct. 903, 39 L.Ed.2d 103 (1974).

approve of *in camera* hearings of this character conducted without the presence of counsel: To the contrary, we are of the opinion that, absent consent of all counsel, *in camera* examinations of jurors should not be conducted by a trial judge without the presence of counsel. What we are holding in this case is that the procedure followed by the trial judge was acquiesced in and such acquiescence resulted in a waiver of any claim of error, in the absence of prejudice.

### *Miscellaneous*

■■■ The defendants raise a number of other points in their appeal. None has merit and all may be quickly disposed of. The brief references during the cross-examination of the defendant John Edward Jones to his earlier federal narcotics conviction, which merely sought to establish the type of offense and not "to probe in depth" the nature "of the felonies, * * * and their details," did not go beyond the bounds established in *United States v. Samuel* (4th Cir. 1970), 431 F.2d 610, 613, *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971), and *United States v. Smith* (4th Cir. 1965), 353 F.2d 166, 168. Similarly, we find the reading of the indictment, followed by appropriate instructions, unobjectionable. *Martin v. United States* (9th Cir. 1964), 335 F.2d 945, 950. The trial court adequately charged the jury on the caution with which accomplice testimony should be received and the care with which it would be weighed.[60] The language as used is actually taken verbatim from § 12.04, Devitt and Blackmar, *Federal Jury Practice and Instructions* (1970 Ed.).

■■ We have, also, examined with care the record and we find no basis for any claim of partiality or bias on the part of the trial judge. This was an extended and difficult case. It was vigorously contested on both sides. The trial judge conducted himself with commendable patience and with fairness to all parties. The attempt to make much of the receipt of a note from the jury and the action of the trial judge with respect to it is both petty and niggling. What the trial judge did when he received the note is in dispute but the record evidences no impatience and, considering the extreme courtesy shown by the trial judge throughout the trial, we find it impossible to read bias or impatience in this incident. As we have said, the conduct of the trial judge throughout the trial was exemplary.

We have reviewed all the claims of error. We find no requirement of a new trial in any of them. The convictions are accordingly affirmed.

*AFFIRMED.*

---

60. The trial judge charged: "However, the jury should keep in mind that such [accomplice] testimony is always to be received with caution and weighed with great care. Furthermore, you should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe the unsupported testimony of the accomplice beyond a reasonable doubt."