UNITED STATES of America

v.

**Jay E. LENTZ, Defendant.**

**No. 1:01 CR 150.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 19, 2005.

Frank Salvato, Alexandria, VA, Amy Leigh Austin, Office of the Public Defend-

er, Richmond, VA, Michael William Lieberman, Office of the Federal Public Defender, Alexandria, VA, for Defendant.

Steven D. Mellin, United States Attorney's Office, Alexandria, VA, for Plaintiff.

### MEMORANDUM OPINION

ELLIS, District Judge.

This kidnapping for murder prosecution resulted initially in a jury verdict of guilty and the imposition of a life sentence. It is now here on remand for a new trial following the Court of Appeals' reversal of the district court's entry of judgment of acquittal and affirmance of the district court's grant of a new trial. At the threshold on remand are defendant's motions for a transfer of venue and a stay pending appeal to the United States Supreme Court, which motions raise the following issues:

(i) whether pre-trial publicity in this case is so inherently prejudicial as to warrant an intra-district venue transfer from Alexandria to Richmond, Virginia; and

(ii) whether the trial in this case should be stayed pending resolution of defendant's petition for writ of *certiorari* in the United States Supreme Court seeking review of the Fourth Circuit's decision to vacate the district court's judgment of acquittal.

### I.

The facts in this case are more fully set forth in the Fourth Circuit's opinion reversing the judgment of acquittal, but upholding the grant of a new trial. *See United States v. Lentz,* 383 F.3d 191, 195 (4th Cir.2004) (*Lentz I* ). For purposes of the issues at bar, it is sufficient to recount the following facts.

This case arises from an alleged kidnapping by defendant Jay E. Lentz ("Lentz") resulting in the death of his ex-wife, Doris Lentz ("Doris"), in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a)(1). Doris Lentz disappeared on April 23, 1996. In her last reported conversation that evening, Doris told a friend she planned to drive from her home in Northern Virginia to Lentz's home in Maryland to pick up her daughter, Julia, after a week of visitation with her father. Following that conversation, no one ever heard from Doris again and her body was never found. On April 28, 1996, authorities found Doris's abandoned car in a District of Columbia parking lot, eight miles from Lentz's home, spattered with Doris's blood, and with Doris's keys and purse in plain view. The government contends that Lentz, involved in a bitter family court litigation with his ex-wife, inveigled Doris across state lines, held her, and killed her. Because a body was never found, the state investigation into the disappearance languished, but the federal investigation continued, ultimately resulting in Lentz's kidnapping indictment over five years later on April 24, 2001.

Two additional years passed before Lentz was finally brought to trial in June 2003. Following a twenty-one day trial, a unanimous jury first found Lentz guilty of kidnapping resulting in death, in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a), and then returned a verdict of life imprisonment. Lentz moved for a judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P., which the district court granted on the ground that the government had not adduced evidence of "holding" sufficient to support a kidnapping conviction.[1] *See United States v. Lentz,* 275 F.Supp.2d 723 (E.D.Va.2003), *rev'd in*

---

1. To establish a violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a)(1), the government must prove, (i) that the victim was willfully transported across state lines, (ii) that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abduct-

*part,* 383 F.3d 191 (4th Cir.2004). Also, shortly after the verdict, three jurors contacted defense counsel to notify them that certain day planners belonging to Doris that were never admitted into evidence[2] had found their way into the jury room and had played a prominent role in the jury's deliberations. The planners contained material not admitted at trial, including (i) Doris's notes regarding Lentz's harassing and threatening behavior directed at her and Julia's day care center, (ii) a list of names and telephone numbers of police officers and a domestic violence support group, (iii) Doris's notes documenting statements Lentz made to Julia about Doris, and (iv) Doris's notes pertaining to her efforts to obtain a protective order against Lentz.

Following the revelation that the planners had somehow reached the jury, Lentz moved to vacate the jury's verdict. The district court concluded that the submission of the evidence "violated [Lentz's] Sixth Amendment right to confrontation and prevented him from receiving a fair trial" and rejected the argument that the admission was harmless because the evidence "completely destroyed the defendant's credibility and therefore, his case."

*United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. Jan. 29, 2004) (Memorandum Opinion). Thus, the district court granted Lentz a new trial pursuant to Rule 33, Fed.R.Crim.P. Thereafter, the government appealed the district court's Rule 29 judgment of acquittal and its Rule 33 grant of a new trial. On appeal, the Fourth Circuit reversed the district court's judgment of acquittal, but upheld the district court's grant of a new trial and remanded the case for further proceedings.

Following receipt of the Fourth Circuit's mandate, a status conference was held on November 17, 2004 and a trial date was set for January 31, 2005.[3] At issue here are two threshold motions filed by Lentz. Specifically, Lentz has filed a (i) motion for a change of venue to the Richmond Division of this district, and (ii) a motion to stay the trial pending filing[4] and resolution of Lentz's *certiorari* petition to the United States Supreme Court. Each motion is separately addressed.

## II.

### A. *Change of Venue*

■■■ Lentz requests an intradistrict transfer to the Richmond Division pursuant to Rule 18, Fed.R.Crim.P.,[5] on the

---

ed, or carried away the victim, (iii) that the defendant held the victim for ransom, reward or otherwise, and (iv) that the victim's death resulted from those actions. *See Lentz I,* 383 F.3d at 199.

2. Short selections from the journals were admitted into evidence, but the journals explicitly were not admitted into evidence in their entirety.

3. *See United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. Nov. 17, 2004) (Order). More recently, at defendant's request, the trial was continued to commence on July 11, 2005. *See United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. Dec. 22, 2004) (Order).

4. Counsel for defendant represented that Lentz's petition for writ of *certiorari* was due on January 10, 2005.

5. Lentz argues that a defendant must demonstrate a lower standard of pre-trial prejudicial publicity to warrant an intradistrict transfer of venue, pursuant to Rule 18, than is required for an interdistrict transfer, pursuant to Rule 21. *See* Rule 18, Fed.R.Crim.P. (requiring court to set place for trial "within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice."); Rule 21(a), Fed.R.Crim.P. (requiring interdistrict transfer "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there"). Yet as the Advisory Committee on Civil Rules has recognized, the principles governing interdistrict transfer of venue for prejudice against the defendant in the transferring district are instructive when considering an intradistrict

ground that prejudicial pre-trial publicity makes it impossible for him to have a fair trial in this division.[6] Not surprisingly, given the unusual nature of the facts, the first trial in this case generated considerable media coverage, extending notably to both the Alexandria and Richmond areas.[7] Yet, the mere fact that a case has drawn media attention does not, by itself, warrant a change in venue. Rather, it is well-settled that "transfers of venue based on pre-trial publicity are not often granted, as 'the effects of pre-trial publicity on the pool from which jurors are drawn is [generally] determined by a careful and searching voir dire examination.'" *United States v. Lindh*, 212 F.Supp.2d 541, 548 (E.D.Va.2002) (citing *United States v. McVeigh*, 918 F.Supp. 1467, 1470 (W.D.Okla.1996)). In this regard, a motion for a change of venue due to prejudicial pre-trial publicity calls for a two-step analysis. First, a motion for a change of venue should not be granted before jury selection unless a trial court determines that "the publicity is so inherently prejudicial that trial proceedings must be pre-

sumed to be tainted." *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir.1991). This is a stringent standard and thus, "only in extreme circumstances may prejudice be presumed from the existence of pre-trial publicity itself." *Id.* (quoting *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir.1987)). Instead, "a trial court should customarily take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists." *Id.* (citing *Wansley v. Slayton*, 487 F.2d 90, 92–93 (4th Cir.1973)). And, significantly, when conducting the *voir dire* it is not necessary that prospective jurors be entirely ignorant of the facts of a case; rather "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Lindh*, 212 F.Supp.2d at 548 (citing *United States v. Bakker*, 925 F.2d 728, 734 (4th Cir.1991) and *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

■ These principles, applied here, compel the conclusion that transfer to the Richmond Division is unwarranted. While

transfer. *See* Rule 18, Fed.R.Crim.P., advisory committee's note to 1966 amendments ("If the court is satisfied that there exists in the place fixed for trial prejudice against the defendant so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where such prejudice does not exist. Cf. Rule 21 dealing with transfers between districts."); *see also United States v. Walker*, 890 F.Supp. 954, 958 n. 5 (D.Kan.1995) (collecting authority finding principles and case law interpreting Rule 21 instructive in the application of Rule 18). And significantly, the constitutional due process implications of either an interdistrict or intradistrict are the same, namely that "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

6. The government considers that Lentz's motion, because it suggests that some witnesses

would find it as easy to travel to Richmond as to Alexandria, should also be read as a request to transfer for purposes of convenience pursuant to Rule 21(b), Fed.R.Crim.P. Lentz in his reply brief makes clear that transfer is not being sought on witness convenience grounds. Yet, even if Lentz sought an intradistrict transfer for reasons of convenience, which would properly be brought as a Rule 18 motion, it is abundantly clear that the Alexandria Division is the appropriate venue within the Eastern District of Virginia, as the majority of the witnesses are located in this division, the defense and prosecution teams are based here, and the prompt administration of justice can be assured here by the scheduling of a prompt trial. *See* Rule 18, Fed.R.Crim.P.

7. The parties have submitted samples of print media coverage from the Washington Post and the Richmond Times–Dispatch.

some or many prospective jurors may have read or listened to media references to this case, a review of the pre-trial publicity in this matter does not establish that this publicity "is so inherently prejudicial that trial proceedings must be presumed to be tainted." [8] *Bakker,* 925 F.2d at 732. Despite some references to prejudicial or inadmissible evidence, the majority of the news coverage consisted of straightforward factual reports of the legal proceedings, rather than inflammatory coverage, and is "hence less likely to poison the jury pool." *Lindh,* 212 F.Supp.2d at 549 (citing *Murphy v. Florida,* 421 U.S. 794, 801 n. 4, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)); *see also Bakker,* 925 F.2d at 732 (denying transfer motion where "vast majority" of evidence reflected "unemotional, factual reports of legal proceedings"). In these circumstances, transfer is unwarranted; instead, a searching *voir dire* is the appropriate means to ensure the defendant's constitutional right to a fair and impartial jury untainted by pre-trial publicity. Thus, all prospective jurors will be questioned about what they have seen, read, or heard about the case. And, as constitutionally required, no juror will be qualified to serve unless it appears that the juror "(i) is able to put aside any previously formed opinions or impressions, (ii) is prepared to pay careful and close attention to the evidence as it is presented in the case and finally (iii) is able to render a fair and impartial verdict based solely on the evidence adduced at trial and the Court's instructions of law." *Lindh,* 212 F.Supp.2d at 549.

■ Lentz challenges the conclusion that pre-trial publicity has not been "inherently prejudicial," by focusing sharply on the nature of the publicity, noting specifically the inadmissible and prejudicial evidence published in the Alexandria-area media. In support of his argument, Lentz cites *United States v. Jones,* 542 F.2d 186 (4th Cir.1976), for the proposition that "[w]ith hardly an exception, the cases in which substantial prejudicial pretrial publicity [has been] found, the publicity involved information about the defendant that would not be admissible before the jury or that was not in fact put before the jury in court." *Id.* at 196 (citations and internal quotation marks omitted). Yet, the mere publication of prejudicial or inadmissible information is not, by itself, sufficient to warrant a transfer. [9] Rather, there must be a showing of "inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors." *Id.* at 193. And even the court in *Jones* recognized that "the proper manner for ascertaining whether the adverse publicity may have biased the prospective jurors was through the voir dire examination." [10]

Such pervasive prejudicial news coverage simply is not present here. To begin

---

**8.** The government also accuses Lentz of using the media in an attempt to alter public opinion and argues that these efforts preclude Lentz from objecting to prejudicial media coverage. *See Bakker,* 925 F.2d at 733 ("[A] defendant should not allowed to manipulate the criminal justice system by generating publicity and then using that same publicity to support his claim that the media attention surrounding his case created a presumption of prejudice."). Yet, this conclusion is unwarranted as the record facts do not support a finding of intentional misuse of the media

much less any evidence of the "calculated media campaign" present in *Bakker. Id.*

**9.** *See, e.g., Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (juror exposure to publicity regarding defendant's prior convictions did not render fair trial impossible).

**10.** *Jones,* 542 F.2d at 193 (finding that dismissal during *voir dire* of eight jurors who had seen publicity regarding case was sufficient to guard against prejudicial pre-trial publicity).

with, the jurors in this division are drawn from a population of more than two million people dispersed across Northern Virginia, from Loudoun County in the North to Stafford County in the South and from Alexandria in the East to Fauquier County in the West.[11] Thus, it is unlikely that unbiased jurors cannot be found in this division given its size and breadth. Cases reaching contrary conclusions involve the saturation of smaller jury pools with prejudicial information and provide an illustrative contrast that supports the result reached here.[12] Moreover, given that the most prejudicial news coverage occurred during the first trial in the summer of 2003, now months in the past, and given that almost two years will have elapsed between this publicity and the time of the rescheduled trial, it is unlikely that this publicity will be fresh in the jurors' minds at the time of jury selection.[13] This underscores that the appropriate course of action in this case is not transfer, but rather the use of a careful *voir dire* examination designed to ferret out any impermissible bias or prejudice arising from pretrial publicity.

In sum, the nature of the pre-trial publicity in this case simply is not so extensive or inherently prejudicial as to warrant the conclusion that a fair and impartial jury, untainted by pretrial publicity, cannot be empaneled in this division. Nor is it likely that such a jury could be empaneled more easily in Richmond.[14] Accordingly, a change of venue to the Richmond Division

---

11. *See* 28 U.S.C. § 127 (defining Virginia's judicial districts); Local Rule 3, E.D. Va. Local Civil R. (defining divisions within Eastern District of Virginia); U.S. Census Bureau, *MapStats: Virginia, at* http://www.fedstats.gov/qf/states/51000.html (last visited Jan. 18, 2005).

12. For illustrative contrasting examples of such "inherently prejudicial publicity," *see, e.g., Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (pretrial publicity warranted change of venue where local television station broadcasted 20–minute film of defendant's confession three times to a community of 150,000); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (publicity in small rural community sufficient to warrant change of venue where publicity reported defendant's confessions to twenty-four burglaries and six murders, including the murder for which he was tried, 90% of veniremen examined were inclined to believe in accused's guilt, and 268 of 430 veniremen were excused for cause); *Coleman v. Kemp,* 778 F.2d 1487 (11th Cir.1985) (publicity in small rural community of 7,059 required change of venue where rape, robbery, and multiple murder received extensive publicity from print and broadcast media as well as word-of mouth communication within community).

13. It is settled that "recency is a critical factor to be considered in connection with any claim of pre-trial prejudicial publicity." *Wansley v. Slayton,* 487 F.2d 90, 93 (4th Cir. 1973) (citing *United States v. Bowe,* 360 F.2d 1, 11 (2d Cir.1966) (twelve-week-old articles including inadmissible evidence unlikely to be retained in minds of jurors)); *see also Patton v. Yount,* 467 U.S. 1025, 1032–33, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (noting that passage of time diminished effect of pretrial publicity on jury pool).

14. Even assuming a change of venue were warranted, Richmond would not be the appropriate forum for such a transfer as the news coverage there, while perhaps somewhat less extensive than the coverage in the Alexandria area, was also significant and also included reports of inadmissible and prejudicial information. More specifically, newspapers with the largest distributions in Alexandria and Richmond both carried articles on the most newsworthy days. And while the Alexandria-area coverage reflected that Lentz was previously convicted by another jury, included quotes from the excluded journals, quotes of inadmissible evidence, and at least one comment from a jury member that once the jury discovered the "golden journals," the jury was no longer deadlocked, the Richmond Times–Dispatch carried stories with equally prejudicial information. Additionally, news coverage in Richmond also included reports of Lentz's conviction, quotes from the inadmissible journals, and an interview with Lentz

or to any other venue is not appropriate and Lentz's first motion must be denied.[15]

### B. Motion for Stay

Lentz also requests a stay of the trial scheduled for January 31, 2005, pending resolution by the United States Supreme Court of Lentz's petition for a writ of *certiorari* to the Fourth Circuit Court of Appeals. Lentz contends that his *certiorari* petition is likely to be granted because it raises substantial questions related to the interpretation of the Federal Kidnapping Act, 18 U.S.C. § 1201, questions, he argues further, that are likely to be heard by the Supreme Court because the Fourth Circuit's opinion in *Lentz I* is at odds with decisions of several other Courts of Appeals. The government vigorously disputes this forecast.

 In the end, it is unnecessary to resolve this dispute as there is neither jurisdiction nor authority to stay, the Fourth Circuit's mandate pending resolution of Lentz's *certiorari* petition. This is so for two reasons: first, a district court has no jurisdiction to stay a circuit court's mandate remanding the case for a new trial to await the outcome of a *certiorari* petition seeking review of the circuit court's decision, as this authority belongs exclusively to the circuit court or to a justice of the Supreme Court. Second, consistent with the "mandate rule," there is no authority to issue a stay or a continuance pending resolution of a party's *certiorari* petition where, as here, the party has already unsuccessfully sought a stay of the circuit court's mandate on the same ground. These two reasons merit elucidation.

To begin with, 28 U.S.C. § 2101(f) makes clear that only an appellate court or a justice of the Supreme Court has jurisdiction to stay an appellate court's final judgment pending Supreme Court review of a *certiorari* petition. That statute provides, in pertinent part, as follows:

> In any case in which the final judgment or decree of any court is subject to review by the Supreme Court on writ of certiorari, the execution and enforcement of such judgment or decree may be stayed for a reasonable time to enable the party aggrieved to obtain a writ of *certiorari* from the Supreme Court. The stay may be granted by a judge of the court rendering the judgment or decree or by a justice of the Supreme Court . . . ."

*See also* Rule 41(d)(2), Fed. R.App. P.; Rule 23, Sup.Ct. R.[16] By its plain language,

---

15. Of course, if, during *voir dire* it becomes clear that it is impossible to select a fair and impartial jury, Lentz may renew his motion for change of venue. *See Lindh*, 212 F.Supp.2d at 550 n. 7; *Blumenfield v. United States*, 284 F.2d 46, 51 (8th Cir.1960) ("The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.") (quoted in *United States v. Jones*, 542 F.2d 186, 193 (4th Cir. 1976)).

16. Rule 41(a)(2), Fed. R.App. P., permits a party to seek a stay of a circuit court's mandate pending filing of a *certiorari* petition, and Rule 23, Sup.Ct. R., governs stay applications submitted to justices of the Supreme Court.

himself following the trial court's decision to enter a judgment of acquittal, in which he described the prosecution as a witch hunt by overzealous prosecutors determined to convict him of a crime he did not commit. Thus, even were the case transferred to Richmond, it would nonetheless require the same remedy, namely a searching *voir dire* to ensure the empaneling of a fair and impartial jury untainted by pre-trial publicity.

Nor is it critical that this case received television news coverage in the Alexandria area, but not in Richmond, for in either location, a prospective juror might be tainted by prejudicial pre-trial coverage, in whatever form, and all prospective jurors would need to be carefully examined to ensure that no such tainted juror is empaneled.

§ 2101(f) confers authority only on the Fourth Circuit or a justice of the Supreme Court to stay execution or enforcement of a Fourth Circuit judgment while awaiting the outcome of a *certiorari* petition. *See In re Stumes,* 681 F.2d 524, 525 (8th Cir. 1982). While it is true, as Lentz observes, that § 2101(f) does not explicitly preclude a district court from issuing such a stay, the great weight of recent, reasoned authority has concluded that § 2101(f) does not permit a district court to exercise jurisdiction to stay a circuit court's final judgment pending filing or resolution of a *certiorari* petition.[17] Nor as a prudential matter would it be appropriate for a district court to exercise jurisdiction to issue such a stay. As one district court put it, it is simply "not an appropriate function for this court to pass on the likelihood that the ruling of a higher court will be accepted for review by the Supreme Court;" rather, that function is properly performed by the court of appeals or the Supreme Court, as contemplated by § 2101(f). *Studiengesellschaft Kohle v. Novamont Corp.,* 578 F.Supp. 78, 79–80 (S.D.N.Y.1983).

In this case, the Fourth Circuit has entered its final judgment overturning the Rule 29 judgment of acquittal, which is the subject of Lentz's petition for *certiorari.* Because the Fourth Circuit's ruling can be said to be its "final judgment or decree" with respect to the judgment of acquittal, § 2101(f) applies,[18] and thus only the Fourth Circuit or a justice of the Supreme Court may issue a stay of the Fourth Circuit's judgment remanding the case to permit Lentz to obtain a writ of *certiorari* from the Supreme Court. Indeed, Lentz moved for a stay from the Fourth Circuit pursuant to Rule 41(d)(2), Fed. R.App. P., which motion was denied, and while he may still apply to the Supreme Court for a stay, he may not do so here.

▬▬ Lentz's motion must also be denied because there is no authority to issue a stay or a continuance pending resolution of a party's *certiorari* petition where, as here, the party already sought and failed to obtain a stay of the circuit court's mandate when the case was on appeal. This is so because to grant such a

**17.** *See, e.g., In re Stumes,* 681 F.2d 524; *Harris v. City of Virginia Beach,* 923 F.Supp. 869, 872–73 (E.D.Va.1996), *rev'd on other grounds,* 110 F.3d 59, 1997 WL 144071 (4th Cir.1997) (unpublished disposition); *Brinkman v. Dep't of Corrections,* 857 F.Supp. 775, 777 (D.Kan. 1994); *Gander v. FMC Corp.,* 733 F.Supp. 1346, 1347 (E.D.Mo.1990); *Mister v. Illinois Cent. Gulf R.R. Co.,* 680 F.Supp. 297, 298 (S.D.Ill.1988); *Hovater v. Equifax Servs., Inc.,* 669 F.Supp. 392, 393 (N.D.Ala.1987); *Deretich v. St. Francis,* 650 F.Supp. 645, 647 (D.Minn.1986); *Studiengesellschaft Kohle v. Novamont Corp.,* 578 F.Supp. 78, 79–80 (S.D.N.Y.1983); *Kozman v. Trans World Airlines, Inc.,* 145 F.Supp. 140 (S.D.N.Y.1956).

There is no Fourth Circuit precedent directly on point. While it is true that the Fourth Circuit arguably implicitly approved a district court's jurisdiction to consider a stay pending resolution of a *certiorari* petition in *Fidelity & Deposit Co. v. Davis,* 127 F.2d 780 (4th Cir. 1942) (issuing ruling on appeal from district

court judgment entered on a bond tendered to secure a stay pending resolution of a *certiorari* petition), the Fourth Circuit did not there squarely address the issue and the great weight of recent, reasoned authority, cited here, reaches the conclusion that a district court may not exercise such jurisdiction.

**18.** Worth noting is that it might be argued that the Fourth Circuit's decision is not a "final judgment or decree" as it does not end the case. Yet, there seems to be little reason to distinguish, for the purposes of § 2101(f), a final decision with respect to a single, case-dispositive issue immediately appealable to the Supreme Court from an appellate ruling that ends the matter. In any event, even assuming, *arguendo,* that there is district court jurisdiction to issue the stay pending Supreme Court review of Lentz's *certiorari* petition, there is no authority to issue such a stay as it is precluded in this case by the mandate rule. *See infra* text accompanying notes 19–23.

stay would be inconsistent with the spirit of the Fourth Circuit's mandate remanding the case for further proceedings. It is settled that, pursuant to the mandate rule, when an appellate court remands an appeal for further proceedings, "a district court must, except in rare circumstances, implement both the letter and spirit of the mandate." [19] *United States v. Bell,* 5 F.3d 64, 66 (4th Cir.1993) (internal quotation marks omitted). Indeed, as the Fourth Circuit has recognized, "few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *Id.* (citing *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 168, 59 S.Ct. 777, 83 L.Ed. 1184 (1939)). To assess whether the mandate rule applies, the district court must determine whether the matter is "within the scope of [the] mandate." *South Atlantic Ltd. P'ship of Tenn. v. Riese,* 356 F.3d 576, 584 (4th Cir.2004). In determining the scope of the mandate, the mandate "does not simply preclude a district court from doing what an appellate court has expressly forbidden it from doing." *Riese,* 356 F.3d at 584. Rather, it "forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Bell,* 5

F.3d at 66; *see also Riese,* 356 F.3d at 584 (holding that a district court "must attempt to implement the spirit of the mandate; and the court may not alter rulings impliedly made by the appellate court").

These principles, applied here, make clear that a stay of this case pending filing of Lentz's *certiorari* petition would violate the "mandate rule," as it would contravene the spirit of the Fourth Circuit's mandate in this case. Significantly, Lentz already requested that the Fourth Circuit stay its mandate pending the filing of his *certiorari* petition, which request was denied. In doing so, the Fourth Circuit, which is well-placed to determine whether the Supreme Court is likely to grant a *certiorari* petition, has already carefully considered Lentz's arguments for a stay and rejected them. While the grant of a stay by the district court in this case would not squarely contradict the letter of the Fourth Circuit's mandate remanding the case for further proceedings,[20] it would clearly violate the mandate's spirit. Put differently, for this Court to grant the stay requested would permit Lentz to obtain in the district court that which the Fourth Circuit explicitly refused. Such a decision would plainly fall within the proscriptions of the mandate rule by revisiting an implied ruling of the circuit court on appeal,[21]

---

**19.** The Fourth Circuit has recognized that the mandate rule would permit a trial court to reopen an issue expressly or impliedly decided by the appellate court only in very limited circumstances not present here including the following:

(1) a showing that controlling legal authority has changed dramatically; (2) that significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or (3) that a blatant error in the prior decision will, if uncorrected, result in a serious injustice.

*United States v. Aramony,* 166 F.3d 655, 662 (4th Cir.1999) (quoting *Bell,* 5 F.3d at 67).

**20.** The Fourth Circuit's October 27, 2004 mandate reads as follows: "This case is remanded to the District Court for further proceedings consistent with the Court's opinion."

*See United States v. Robinson,* 390 F.3d 833 (4th Cir.2004) (upholding continuance of re-sentencing proceedings because mandate remanding for re-sentencing proceedings did not specify particular time for re-sentencing to occur).

**21.** *Riese,* 356 F.3d at 584. Of course, while the mandate rule bars a district court from ruling on issues expressly or impliedly within the mandate's scope, it does not apply beyond that scope. *See P & G Co. v. Haugen,* 317 F.3d 1121, 1126 (10th Cir.2003) ("Although a district court is bound to follow the mandate, and the mandate 'controls all matters within its scope, a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.'") (citing *Newball v. Offshore Logistics Int'l,* 803 F.2d 821, 826 (5th Cir.1986)). The Fourth Cir-

namely that Lentz had not demonstrated, as required by Rule 41(d)(2), Fed. R.App. P, both that his *certiorari* petition presented a substantial question and that there was good cause for a stay.

■ Lentz attempts to avoid this conclusion by arguing that, even if the Fourth Circuit's mandate cannot be stayed, the trial may be continued pending resolution of his *certiorari* petition as an exercise of the Court's discretion to manage its docket. To be sure, a district court retains discretion on remand to schedule cases and to set its docket to accommodate the demands of literally hundreds of cases.[22] *See Robinson*, 390 F.3d 833 (recognizing that "a trial court possesses broad discretion on matters of scheduling and, more specifically on matters relating to granting or denying continuances") (citing *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)). Nonetheless, a district court may only invoke this discretion to the extent that its exercise is consistent with the letter and the spirit of a circuit court's mandate. Here, a continuance is plainly unwarranted in light of the Fourth Circuit's denial of Lentz's application for a stay.[23]

In sum, a district court has no jurisdiction to stay a circuit court's mandate simply to await the outcome of a *certiorari* petition seeking review of the circuit court's decision on appeal. Moreover, there is no authority to issue such a stay where, as here, the circuit court has already denied petitioner's motion for a stay pursuant to Rule 41(d)(2), Fed. R.App. P. In these circumstances, a district court's issuance of a stay would countermand the spirit of the circuit court's mandate remanding the case for further proceedings. Accordingly, Lentz's second motion must also be denied.

Appropriate orders have issued.

cuit's recent decision in *United States v. Robinson*, 390 F.3d 833 (4th Cir.2004) provides an illustrative example. There, the Fourth Circuit upheld a continuance of re-sentencing proceedings on remand pending the issuance of a Supreme Court ruling in a different case that raised issues identical to those raised in *Robinson*. But, different from the facts in this case, there was no apparent basis for the party seeking a continuance in *Robinson* to move for a stay of the mandate in the Fourth Circuit as Rule 41(d)(2), Fed. R.App. P., applies only to stays sought in a proceeding in which *certiorari* is also sought. *Id.* Thus, different from this case, the stay ordered in *Robinson* was not a departure from the spirit of the mandate.

**22.** Indeed, such discretion was exercised to grant Lentz's separate motion to continue the trial scheduled for January 31, 2005 on the

basis of defense counsel's representations that his obligations to a defendant in a multi-defendant death penalty case, also scheduled in this division and in close proximity to the trial date scheduled in this case, would make it impossible for him to adequately represent Lentz in his trial. *See United States v. Lentz*, Case No. 1:01cr150 (E.D.Va. Dec. 22, 2004) (Order) (granting defendant's motion for continuance).

**23.** Nor is Lentz's double jeopardy argument persuasive for it is settled that the Double Jeopardy Clause is not implicated when a new trial is ordered on remand from a successful appeal unless the successful appeal is based on an insufficiency of evidence to support the verdict, which is not the case here. *See United States v. Scott*, 437 U.S. 82, 91–92, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).